**YACHTS AMERICA, INC., and Thomas Bruce Wilson**

v.

**The UNITED STATES.**

**No. 239–79L.**

United States Court of Claims.

Feb. 24, 1982.

Stephen Leventhal, Bethesda, Md., attorney of record, for plaintiffs.

Dorothy R. Burakreis, Washington, D. C., with whom was Asst. Atty. Gen., Carol E. Dinkins, Washington, D. C., for defendant. Carolyn P. Osolinik, and Thomas S. Jackson, Patricia D. Gurne, and Jackson, Campbell & Parkinson, P. C., Washington, D. C., of counsel.

Before COWEN, Senior Judge, and NICHOLS and KASHIWA, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT AS TO LIABILITY

KASHIWA, Judge:

This case is before the court on defendant's motion for summary judgment and on plaintiffs' motion for partial summary judgment. After considering the parties' submissions and oral argument, we deny in part plaintiffs' motion for partial summary judgment, allow in part defendant's motion for summary judgment, and remand the remainder of the case to a trial judge for further determination.

Plaintiffs are Yachts America, Inc. (Yachts) and Yachts' president, Thomas Wilson. In October 1972, Yachts leased some eight acres of marina property along the Potomac River in Maryland from Fort

Washington Marina, Inc. (Fort Washington). The leasehold was for a two-year period beginning November 1, 1972, at a monthly rental of $6,000. The lease allowed Yachts an option, exercisable prior to July 31, 1974, to purchase the marina property. The lease contained no provision allocating condemnation proceeds but did specify the leasehold would terminate if Yachts, pursuant to a governmental taking, was required to surrender possession of the premises.

The relationship between Yachts and Fort Washington was far from harmonious. Ultimately, Yachts brought at least three actions against its landlord. One action for breach of the lease agreement was filed November 30, 1973, in the Circuit Court for Prince George's County, Maryland, as Legal Action No. 56019 (the first breach suit). The first breach suit originally alleged Fort Washington had violated the lease by requiring excessive fire insurance, failing to pay for certain sewer improvements, and encumbering the marina property. Ultimately, the first breach suit also alleged Fort Washington violated the lease by not selling the marina property to Yachts. A second breach suit identical to the first was subsequently filed as Legal Action No. 5665 in the Circuit Court for St. Mary's County, Maryland. The date of the second breach suit's filing is unclear from the record.

In a third suit, Prince George's County Circuit Court Equity Action No. D–8967, Yachts sought ownership of the marina property (referred to hereafter as the equity action or the equity litigation). The filing date of the equity action is also not set forth in this record. Equity Action No. D–8967 alleged that Yachts had properly exercised the purchase option, that Fort Washington had not performed, and that Yachts was entitled to have the property conveyed.

While these lawsuits were pending, the United States became owner of the marina property on October 15, 1974, through Pub. L.No.93–444, 88 Stat. 1304 (1974). In relevant part, Pub.L.No.93–444, *supra*, provides:

* * * "Effective on the date of enactment of this Act, there is hereby vested in the United States all right, title and interest in, and the right to immediate possession of, all real property within the boundaries of the parcels designated A, B, C, and D, as shown on the drawing referenced in subsection 2(b). The United States will pay just compensation to the owners of any property taken pursuant to this subsection and the full faith and credit of the United States is hereby pledged to the payment of any judgment so entered against the United States. Payment shall be made by the Secretary of the Treasury from moneys available and appropriated from the Land and Water Conservation Fund, subject to the appropriation limitation contained in section 4 of this Act, upon certification to him by the Secretary of the Interior of the agreed negotiated value of such property, or the valuation of the property awarded by judgment, including interest at the rate of six (6) per centum per annum from the date of taking to the date of payment therefor. In the absence of a negotiated settlement or an action by the owner within one year after the date of enactment of this Act, the Secretary may initiate proceedings at any time seeking a determination of just compensation in a court of competent jurisdiction. The Secretary shall allow for the orderly termination of all operations on real property acquired by the United States in parcels A, B, C, and D of this subsection, and for the removal of equipment, facilities, and personal property therefrom: *Provided,* That in no event shall the Secretary allow operations at the Marshall Hall Amusement Park to continue beyond January 1, 1980. The Secretary shall, on lands acquired for the purposes of this park, implement a development plan which will assure public access to, and public use and enjoyment of, such lands. To further the preservation objective of this Act, the Secretary of the Interior may accept donations of scenic easements in the land within the area designated as 'Scenic Protection Area' on

the drawing referred to in subsection (b) of this section."

\*   \*   \*   \*   \*   \*

The marina property was located within Parcel D and thus originally was subject to the orderly termination provision. Parcel D subsequently was exempted from that provision by section 305 of Pub.L.No.94–578, 90 Stat. 2732 (1976). In June 1975, the United States and Fort Washington negotiated $750,000 as compensation for Parcel D. In recognition of Yachts' then pending litigation and two mortgages of the property, the $750,000 was paid into escrow.

On October 8, 1975, Fort Washington and Yachts settled their disputes. In the settlement agreement, a mutual release, each party agreed in broad language to:

\* \* \* release and forever discharge each other mutually and reciprocally, from all claims, demands, and causes of action that they now have or that might subsequently accrue to them arising out of or connected with, directly or indirectly, the aforementioned [lease] agreements between the parties, including, but not limited to, all claims, actions, or issues as set forth in the litigation between the parties known as Law No. 56019, in the Circuit Court for Prince George's County, Maryland, Law No. 5665, in the Circuit Court for St. Mary's County, Maryland, and Equity No. D–8967, in the Circuit Court for Prince George's County, Maryland.

Fort Washington also agreed to allow a $300,000 judgment to be entered in favor of Yachts and against Fort Washington. A contemporaneous consent decree in the equity action entered the $300,000 judgment in favor of Yachts and against Fort Washington, denied Yachts specific performance, and dismissed with prejudice all other claims and issues in that litigation. In separate proceedings, Yachts' breach actions were voluntarily dismissed with prejudice. Shortly after the actions were settled, Fort Washington became insolvent.

In June 1976, Yachts brought suit in federal district court against the United States, Fort Washington, and the escrow agent holding the $750,000. Count I of that petition alleged Pub.L.No.93–444, *supra*, was unconstitutional in scope and purpose, while Count II alternatively sought just compensation for Yachts' purported ownership of the marina property. Eventually, the United States was granted summary judgment as to Count I. Further, the district court held all claims by Yachts against Fort Washington barred by res judicata arising from the state court consent decree. Yachts then secured voluntary dismissals without prejudice as to its remaining district court claims. In the interim since the district court dismissals, the $750,000 held in escrow has apparently been disbursed to Fort Washington's creditors other than Yachts. Yachts' $300,000 judgment against Fort Washington remains unsatisfied.

The petition in this court was filed in June 1979 and alleges three broad causes of action for just compensation. For simplicity's sake, we refer to these as Count I, Count II, and Count III. In a counterclaim, defendant seeks rent for Yachts' occupancy of the marina property since the date of taking.

## I.

Count I of the petition appears to state two claims for just compensation. One claim is that compensation is owed for Yachts' alleged equitable ownership of the marina property. We refer to this as the Count I ownership claim. The second claim in Count I is that regardless of the property's ownership, a compensable taking of Yachts' business has occurred. We refer to this as the Count I business claim.

The parties' efforts thus far have centered largely on whether the Count I ownership claim is barred by either res judicata or collateral estoppel. Indeed, the record and argument as to the Count I business claim are so scant that as to that claim, we must deny either party summary judgment and remand to a trial judge for further determination. As to the Count I owner-

ship claim, we turn first to the Government's assertion of collateral estoppel.[1]

Under the Government's view, collateral estoppel now bars plaintiffs from relitigating an essential element of the Count I ownership claim, *viz.*, whether Yachts obtained equitable ownership through a July 1974 exercise of the purchase option. If plaintiffs are indeed unable to assert ownership, the Count I claim for a taking of that ownership will necessarily fail.

■ Collateral estoppel bars the relitigation of issues that have been adjudicated in a previous suit. *E.g., Commissioner v. Sunnen*, 333 U.S. 591, 597–598, 68 S.Ct. 715, 719–720, 92 L.Ed. 898 (1948); *Berdick v. United States*, 222 Ct.Cl. 94, 101–104, 612 F.2d 533, 537–538 (1979); *McGinty v. United States*, 151 Ct.Cl. 399, 403 (1960), *cert. denied*, 368 U.S. 867, 82 S.Ct. 115, 7 L.Ed.2d 63 (1961). At one time, collateral estoppel was limited by the mutuality doctrine to circumstances where both parties in the second suit were litigants in the first suit and thus mutually bound by the previous judgment. *See Triplett v. Lowell*, 297 U.S. 638, 642, 56 S.Ct. 645, 647, 80 L.Ed. 949 (1936). In a line of cases beginning with *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), the Supreme Court has rejected the requirement of mutuality. Other notable cases in the progression include *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979), and *Montana v. United States*, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979).

In *Carter-Wallace, Inc. v. United States*, 204 Ct.Cl. 341, 496 F.2d 535 (1974), we identified the considerations relevant when collateral estoppel is sought in post-*Blonder-Tongue* patent litigation. In *Carter-Wallace, supra*, we said:

* * * The guidelines suggested by the Supreme Court [in *Blonder-Tongue*] require that once the defense of estoppel is raised by the accused infringer, the court must first consider whether the issue of invalidity common to each action is substantially identical and whether in the earlier suit the patentee had had a full and fair opportunity to litigate the issue of invalidity (402 U.S. at 333, 91 S.Ct. at 1445). This determination of fairness, said the Court, must be based on an examination of the patentee's incentive to litigate the prior action, his choice of forum, his ability to procure crucial evidence and witnesses for that trial, and other factors, for instance, if the issue is non-obviousness, whether the first court adhered to prior guidelines established by the Court in determining patent validity. It is significant that the Court placed the burden on the plaintiff-patentee to show that he did not have a full and fair opportunity to litigate. [204 Ct.Cl. at 348, 496 F.2d at 538–539.]

Similar guidelines are now applicable to all litigation in this court. *See, e.g., Monterey Life Systems, Inc. v. United States*, 225 Ct.Cl. ——, ——, 635 F.2d 821, 826–827 (1980). We thus need not consider whether the United States would meet the former mutuality requirement.

It is apparent that if collateral estoppel is present here, it can arise only as to issues determined by the consent decree in the equity action. The federal district court's decision that the taking Act was constitutional determined no issues relevant to the Count I ownership claim. Likewise, its decision that Yachts' claims against Fort Washington became res judicata in the equity action necessarily resolved no issue not determined by the equity action consent decree. We turn, therefore, to the equity litigation.

---

1. The United States was not a party to the breach suits or the equity action between Yachts and Fort Washington, nor was there a decision on the merits of Yachts' district court claim for just compensation. It thus appears the United States can claim res judicata only as a privy to Fort Washington in the equity litigation. In light of our conclusion, *infra*, that collateral estoppel precludes the Count I ownership claim, we expressly decline to reach the res judicata issue.

Yachts' bill of complaint in Equity Action No. D–8967 alleged it had entered a lease agreement with Fort Washington. The bill of complaint further alleged:

2. That this same Lease Agreement provided the plaintiff an option to purchase the said property pursuant to a Sales Agreement which was attached to the said Lease Agreement and is attached hereto, the terms of which are incorporated herein, and which is marked Exhibit 2.

\*    \*    \*    \*    \*    \*

4. That the plaintiff, pursuant to the terms of the Lease Agreement exercised its option to purchase the said property by letter dated July 20, 1974, a copy of which is attached hereto, the terms of which are incorporated herein, and is marked Exhibit 5. The letter requested that the defendant select [a] Sales Agreement, Exhibit 2 or Exhibit 4, or a proper substitute therefore [sic] which he would execute, to execute that agreement, and return it to the plaintiff so that the plaintiff could arrange for settlement.

5. That the plaintiff has fully performed all things required by the Lease Agreement to execute his option but that the defendant has failed and refused to execute the Sales Agreement or to proceed to settlement and to convey the property in accordance with the terms of the Lease Agreement or Sales Contract.

\*    \*    \*    \*    \*    \*

Based on those allegations, plaintiffs sought:

1. That the purchase option and the Lease Agreement be specifically enforced.

2. That the Lease Agreement be specifically enforced.

3. That the Sales Agreement properly attached to the Lease Agreement be specifically enforced.

4. That a trustee be appointed to convey said property to plaintiff.

5. That the defendant be required to finance the property in accordance with the terms of the Sales Agreement.

6. That the defendant, pursuant to Maryland Rules 370b4 and 372e be required to verify his answer to this petition.

7. That the plaintiff have such other and further relief as the case may require.

Plainly, whether Yachts properly exercised the purchase option was of critical importance to the equity litigation.

The October 8, 1975, consent decree which terminated the equity litigation entered a money judgment of $300,000 in Yachts' favor against Fort Washington, denied specific performance as no longer available, and further ordered:

\*  \*  \* that all other claims, counts, counter-claims, and/or all other issues of any nature whatsoever, be, and the same are hereby dismissed with prejudice; \* \*.

Inasmuch as the consent decree does not hold specifically that Yachts properly exercised the purchase option, the "all other issues \* \* \* be \* \* \* dismissed with prejudice" language constitutes a final judgment *against* Yachts on that issue. Plaintiffs cannot seriously argue that this identical issue is not present in the Count I ownership claim. Without proper exercise of the purchase option, Yachts can claim no ownership of the property. Nor does Yachts seriously contend on this record that it lacked full and fair opportunity to litigate this critical issue. Under the criteria we set out in *Carter-Wallace, supra,* it would appear plaintiffs in the present litigation should be collaterally estopped from asserting proper exercise of the purchase option.

This result is not altered by the fact that this decree was entered on the parties' consent. In *Green v. Ancora-Citronelle Corp.,* 577 F.2d 1380 (9th Cir. 1978), the court addressed this very contention, holding:

There is no question here that the prior state court judgment was a final judgment on the merits of the issues raised in that action. The fact that this judgment was the result of the parties' stipulation of settlement does not detract from its being considered a conclusive determina-

tion of the merits of that action for purposes of collateral estoppel where, as here, it is clear that the parties intended the stipulation of settlement and judgment entered thereon to adjudicate once and for all the issues raised in that action. 1B Moore's Federal Practice ¶ 0.444[1] (2d ed. 1974). [577 F.2d at 1383.]

See generally Red Lake Band v. United States, 221 Ct.Cl. 325, 331–333, 607 F.2d 930, 934 (1979); 1B Moore's Federal Practice ¶ 0.444[3], at 4009–4024 (2d ed. 1980).

We have already set out the broad language contained in the consent decree precluding further suit. Similar far-reaching, preclusive language is contained within the mutual release Yachts and Fort Washington executed:

### MUTUAL RELEASE AND ASSIGNMENT

This Mutual Release * * * is intended to effect the extinguishment of any and all obligations, claims, demands, or issues whatsoever (including but not limited to) those [directly] arising out of * * * or indirectly resulting from a certain Lease Agreement entered into on October 30, 1972, by and between FORT WASHINGTON MARINA, INC., and YACHTS AMERICA, INC., and THOMAS BRUCE WILSON, and all sales or other agreements attendant thereto whether written or oral.

Certain disputes and differences have arisen between the parties of the first part and the parties of the second part as a result of the aforementioned agreement or agreements, and the parties have agreed to execute this Mutual Release in settlement of such disputes and differences. In consideration of the mutual relinquishment of their respective legal rights with reference to these disputes and differences, in consideration of the execution of this Mutual Release, * * * each party, for himself, his heirs, successors, and legal representatives or assigns, expressly releases the other, his heirs, successors, and legal representatives or assigns, from any and all liability whatso-

ever for claims and/or demands of every nature whatsoever from the beginning of the world to the date first above written.

Additionally, and for the elements of consideration aforementioned, the parties of the first part and the parties of the second part for themselves and their heirs, legal representatives, and assigns, release and forever discharge each other mutually and reciprocally, from all claims, demands, and causes of action that they now have or that might subsequently accrue to them arising out of or connected with, directly or indirectly, the aforementioned agreements between the parties, including, but not limited to, all claims, actions, or issues as set forth in the litigation between the parties known as Law No. 56019, in the Circuit Court for Prince George's County, Maryland, Law No. 5665, in the Circuit Court for St. Mary's County, Maryland, and Equity No. D–8967, in the Circuit Court for Prince George's County, Maryland.

A Consent Decree has been entered into by and between the parties hereto and filed in the aforementioned proceedings, a copy of which is attached hereto and made a part hereof.

Read together, the consent decree and the mutual release demonstrate with clarity that the parties intended "to adjudicate once and for all the issues raised" in Equity Action D–8967. Green v. Ancora-Citronelle, supra.

Yachts' best argument against this result is that the consent decree constitutes an "implicit" holding that Yachts did exercise the option. If so, these plaintiffs might be entitled to use the decree offensively to establish ownership. See Parklane Hosiery Co. v. Shore, supra, 439 U.S. at 331, 99 S.Ct. at 651–652. To support their view of the consent decree, plaintiffs point to an interlocutory ruling in the first breach suit, Prince George's County Circuit Court Legal Action No. 56019, that Yachts exercised the option.

That interlocutory ruling, however, simply was never incorporated, or even referred to, in the consent decree resolving

the equity action. Interlocutory conclusions, of course, do not constitute final dispositions and neither res judicata or collateral estoppel arise from them. The cases so holding are legion. *E.g., Cromwell v. County of Sac,* 94 U.S. 351, 352–353, 24 L.Ed. 195 (1876); *Barrington Manor Apts. Corp. v. United States,* 183 Ct.Cl. 312, 320 n.4, 392 F.2d 224, 228 n.4 (1968); *see* 1B Moore's Federal Practice, *supra* ¶ 0.409[1], at 1001–1012, and cases cited therein. Plaintiffs' suggestion that we read the interlocutory ruling into the final consent decree is tantamount to a suggestion that the interlocutory ruling itself be given collateral estoppel effect. Given the overwhelming authority against the latter proposition, the consent decree must be read as a final determination that Yachts did not properly exercise the purchase option. We so hold.

It follows that collateral estoppel now precludes plaintiffs from relitigating whether the option was properly exercised. Unable to assert equitable ownership of the property, plaintiffs' Count I ownership claim necessarily fails. To that extent, summary judgment in defendant's favor is appropriate on Count I of the petition. We thus need not consider whether res judicata also would preclude the Count I ownership claim. *See* note 1, *supra.*

## II.

Plaintiffs' Count II alleges just compensation is owed for a taking of Yachts' leasehold. Less clear is a related assertion in Count II that the United States must pay for certain improvements Yachts made during the tenancy.

Regarding the alleged taking of Yachts' leasehold, the parties agree Yachts continued in possession until the leasehold expired on November 1, 1974, some 17 days after Pub.L.No.93–444, *supra,* was enacted. The parties appear to dispute, however, whether Government actions during these 17 days deprived Yachts of its leasehold notwithstanding Yachts' continuing possession. As with the Count I business claim, *supra,* we find the present record and argument too scant to decide this or the related claim of a compensable interest in several improvements to the premises. We therefore remand the Count II claims for further proceedings before a trial judge.

## III.

Plaintiffs' final cause of action is that Pub.L.No.93–444, *supra,* granted them a compensable right to terminate their marina business in an orderly manner. Plaintiffs continue that Pub.L.No.94–578, *supra,* which subsequently exempted the marina property from the orderly termination provision, constitutes a taking of that supposed right for which compensation must be paid.

In relevant part, Pub.L.No.93–444, *supra,* provides:

> * * * The Secretary shall allow for the orderly termination of all operations on real property acquired by the United States in parcels A, B, C, and D of this subsection, and for the removal of equipment, facilities, and personal property therefrom: *Provided,* That in no event shall the Secretary allow operations at the Marshall Hall Amusement Park to continue beyond January 1, 1980. * * *

Section 305 of Pub.L.No.94–578, *supra,* provides:

> SEC. 305. Section 2(c) of the Act of October 4, 1961 (75 Stat. 780), providing for the preservation and protection of certain lands in Prince George's and Charles Counties, Maryland, as amended (88 Stat. 1304), is further amended by changing the fifth sentence by deleting "parcels A, B, C, and D" and inserting in lieu thereof "parcels A, B, and C".

We assume *arguendo* that an allowance "for orderly termination," if granted, may be other than a revocable license to operate. We also assume *arguendo* that plaintiffs' Count III claim is not precluded by Yachts' continued possession and operation of the marina property after the enactment of Pub.L.No.93–444, *supra.* Nevertheless, plaintiffs are not entitled to recover on the Count III claim.

After a careful review of these statutes and their legislative history, we are unable

to accept plaintiffs' view that Pub.L.No.93–444, *supra*, granted a "right" of orderly termination or that Pub.L.No.94–578, *supra*, revoked such a "right." Particularly revealing are the Reports which accompanied H.R.13713, which ultimately became Pub.L.No.94–578, *supra*.

The Senate and the House Reports explain the section 305 exemption identically:

### PISCATAWAY PARK, MD.

This change is a technical amendment to resolve a misunderstanding that has arisen from the Act in the 93rd Congress which authorized additions to the Piscataway Park. The National Park Service presently intends to terminate the operation of the marina. In reviewing the history of the legislation, it is apparent that there was no intent on the part of the Committee to force the closure of this facility. The concern of the Congress in this case is to protect the view from Mount Vernon. While an expansion of the marina, which would alter the appearance of this area, would not be acceptable, there is certainly no reason why the existing facility could not continue to provide a worthwhile service in the area. This amendment to the law is designed to permit the continued operation of the marina. Any measures, such as repainting with an unobtrusive color, which the National Park Service can take to reduce the prominence of the marina as viewed from Mount Vernon would be in keeping with the purposes of the Act. [S.Rep.No.1158, 94th Cong., 2d Sess. 11–12 (1976); H.R.Rep.No.1162, 94th Cong., 2d Sess. 6 (1976) 90 Stat. 2732.]

The technical explanations in the Reports are even more concise:

Section 305 is a clarifying amendment which provides that the Fort Washington Marina in Piscataway Park, Maryland, continue in operation. [S.Rep.No.1158, *supra*, at 15; H.R.Rep.No.1162, *supra*, at 8.]

That the Department of the Interior indeed viewed Pub.L.No.93–444, *supra*, as *requiring* termination of the marina operation is confirmed by the Department's analysis of the changes section 305 of H.R.13713 would make:

*Piscataway Park, Maryland*

Section 305 of the bill would specifically delete Parcel D (the Fort Washington Marina at Piscataway Park) from the phase out requirements of Public Law 93–444.

It is the opinion of the Solicitor of this Department that the provisions of Public Law 93–444, enacted on October 15, 1974, provide that the operations at Fort Washington Marina should be terminated in an orderly manner. Accordingly, this Department had proposed to phase out the marina. In the House Report (No. 94–1162) the House Committee stated that there was no intent on the part of the Committee to force the closure of this facility in Public Law 93–444. This Department does not object to this subsection of the bill and it welcomes action by the Congress to clarify the status of the marina operation. [Letter from John Kyl, Assistant Secretary of the Department of the Interior, to the Honorable Henry M. Jackson, Chairman of the Senate Committee on Interior and Insular Affairs (July 23, 1976), *reprinted in* S.Rep.No.1158, *supra*, at 22.]

■ The inescapable conclusion is not that Congress granted and then withdrew a "right" of orderly termination. Instead, it is that Congress made clear in Pub.L.No.94–578, *supra*, that the Interior Department was under no duty by virtue of Pub.L.No.93–444, *supra*, to terminate Yachts' existing marina operations. The implication, obviously, is that Yachts' existing operation was to be dealt with as would other concessions on National Park Service land. We hold that Pub.L.No.93–444, *supra*, did not create, and Pub.L.No.94–578, *supra*, did not revoke, a "right" in plaintiffs to orderly terminate the marina operation. Summary judgment in defendant's favor is appropriate on Count III of the petition.

### IV.

Remaining for resolution is defendant's counterclaim for reasonable rent since the taking of the marina property.

■ Yachts apparently continues to occupy the marina property. We have long recognized that one who occupies the premises of another does so, absent contrary agreement, with the implied obligation to pay a reasonable rental therefor. *See, e.g., Niagara Falls Bridge Commission v. United States*, 111 Ct.Cl. 338, 352, 76 F.Supp. 1018, 1019 (1948). Similarly, when a lessee holds over without new agreement after the expiration of his lease, the terms of the old lease agreement apply. *See Garrity v. United States*, 107 Ct.Cl. 92, 98, 67 F.Supp. 821, 822 (1946). As a defense to the counterclaim, plaintiffs allege, and portions of the record support, that Yachts had an agreement with the National Park Service to occupy the marina property rent free. Portions of the record, however, also support the Government's assertion that it has consistently demanded rent for periods after the enactment of Pub.L.No.93–444, *supra*, and never entered a no-rent agreement with Yachts. Inasmuch as material facts are in dispute, summary judgment for either party as to the counterclaim is inappropriate. We therefore deny without prejudice defendant's motion for summary judgment and plaintiffs' motion for partial summary judgment as to the counterclaim. We remand the counterclaim to a trial judge for further determination.

## CONCLUSION

Regarding the present petition's Count I ownership claim and Count III claim, we find no issue of material fact exists to preclude summary judgment. After fully considering the parties' submissions, we conclude summary judgment for defendant appropriate on those claims. To that extent, defendant's motion for summary judgment is hereby granted and plaintiffs' motion for partial summary judgment is hereby denied.

However, we conclude issues of material fact render summary judgment inappropriate on the present petition's Count I business claim and Count II claims, as well as defendant's counterclaim. To that extent, defendant's motion for summary judgment and plaintiffs' motion for partial summary judgment are hereby denied without prejudice. The present petition's Count I business claim and Count II claims, as well as defendant's counterclaim, are hereby remanded to a trial judge for further proceedings consistent with this opinion.

NICHOLS, Judge, concurring and dissenting:

We must be grateful to Judge Kashiwa for clearing away the fog that surrounded this case, that is, most of it. I join in the opinion except where I indicate specific disagreement.

In view of the holding of the court that plaintiff did not effectively exercise its option and thus became equitable owner, plaintiff does not have a valid Count I claim for destruction of business. In the first place, it is undisputed that it was not destroyed. Congress was willing it should be continued at the same site, and plaintiff remained in possession, though ostensibly as a tenant at sufferance, until at least the filing of the petition in this court. Secondly, any interference with the business was compensable under the fifth amendment only indirectly, to the extent the land's adaptability to the business was an element to consider in the value of the land; not as a separate item. *Mitchell v. United States*, 267 U.S. 341, 45 S.Ct. 293, 69 L.Ed. 644 (1925). The neglect of the parties to tell us much about the business claim is easily explained: it rose or fell with the issue whether plaintiff had exercised its option and became the equitable owner of the real estate.

As the option was not exercised and the lease had only 17 days to run on the taking date, there is nothing left to litigate under Count II. In view of Clause 12 of the lease, entitled *Effect of Condemnation* the leasehold terminated as of the time possession had to be surrendered. If plaintiff did not have to surrender possession, nothing happened to terminate the leasehold and it continued to the end of the lease term. If plaintiff did have to surrender possession, Article 12 cuts off its recovery. Obviously

Article 12 was intended to cut off the lessee from claiming a share of the award in case any taker by eminent domain exercised its right to possession and thus interfered with the lease. Article 12 was a bargain that even if this occurred, the condemnation award would all go to the lessor. In either case, the cause of action under Count II depends on valid exercise of the option, just as Count I does, and Count II fails under the court's conclusion the same as Count I.

Count III is based on plaintiff's theory that Pub.L.No.93–444 cut off the right to "orderly termination," *i.e.*, indefinite occupancy of the site by plaintiff. We have concluded that it was meant to permit plaintiff to occupy indefinitely. This disposes of Count III.

In my view, therefore, the only issues remaining for trial are those under defendant's counterclaim.