**YACHTS AMERICA, INC. and Thomas Bruce Wilson, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**Nos. 239–79L; 568–83C.**

United States Claims Court.

May 29, 1985.

---

Stephen Leventhal, Bethesda, Md., for plaintiffs. Robert J. Zweibel, Bethesda, Md., of counsel.

Dorothy R. Burakreis, Washington, D.C., and E. Kathleen Shahan, Washington, D.C., with whom was Asst. Atty. Gen. F. Henry Habicht II and Acting Asst. Atty. Gen. Richard K. Willard, Washington, D.C. Blake A. Watson, and Kevin Voyles, Washington, D.C., of counsel.

## MEMORANDUM ORDER

MAYER, Judge.

This is a motion for relief from the judgments entered in these cases on November 20, 1984, filed pursuant to Rule 60(b) of this court, which is essentially the same as Federal Rule of Civil Procedure 60(b). The asserted basis of the motion is the existence of "newly discovered evidence." It also raises a jurisdictional question on which the Court of Appeals for the Federal Circuit has not yet ruled. Earlier phases of the cases in this court and its predecessor are reported at 3 Cl.Ct. 447 (1983) (No. 568–83C) and 673 F.2d 356, 230 Ct.Cl. 26 (1982) (No. 239–79L). The final disposition of No. 239–79L is memorialized in an unpublished memorandum filed November 19, 1984, attached as an appendix, and that decision also concluded No. 568–83C. Only the facts necessary to this motion are set out here.

*Jurisdiction*

■ These cases are now consolidated on appeal. As a general proposition, once final judgment is entered and a timely notice of appeal has been filed, the trial court loses jurisdiction over the case except to act in aid of the appeal or to correct clerical errors. *See, e.g., CED's Inc. v. United States,* 745 F.2d 1092, 1095 (7th Cir.1984); *Nicol v. Gulf Fleet Supply Vessels, Inc.,* 743 F.2d 298, 299 (5th Cir.1984); *Main Line Federal Savings & Loan Ass'n. v. Tri-Kell, Inc.,* 721 F.2d 904, 906 (3rd Cir. 1983); *see also* 7 Moore's Federal Practice ¶ 60.30[2] at 60–331. Without jurisdiction, this court is without power to grant relief under Rule 60(b). *See Commonwealth of Puerto Rico v. S.S. Zoe Colocotroni,* 601 F.2d 39, 40 (1st Cir.1979).

When a Rule 60(b) motion is filed while an appeal is pending, there is a divergence of views among the courts of appeals about the appropriate procedure the trial court should follow in addressing it. The procedure roughly resolves into two approaches. *See Long v. Bureau of Economic Analysis,* 646 F.2d 1310, 1318 (9th Cir.), *vacated on other grounds,* 454 U.S. 934, 102 S.Ct. 468, 70 L.Ed.2d 242 (1981); 11 Wright & Miller, Federal Practice and Procedure § 2873; 7 Moore's Federal Practice ¶ 60.-30[2]. One approach is that the trial court be asked to indicate whether it wishes to entertain the motion. If it does, leave of the court of appeals for remand of the case must be secured. *See, e.g., Scott v. Younger,* 739 F.2d 1464, 1466 (9th Cir. 1984); *Diapulse Corp. v. Curtis Publishing Co.,* 374 F.2d 442, 447 (2d Cir.1967). In these circuits, then, the case must be re-

manded before a Rule 60(b) motion may be filed. *See S.S. Zoe Colocotroni,* 601 F.2d at 41.

The second approach does not require a remand before a Rule 60(b) motion is denied, although in common with the first method no relief may be granted absent a remand. The trial court may either deny the motion or indicate that it would be inclined to grant it if the court of appeals remanded. Courts following this approach have

> expressly recognized the power of the district court to consider on the merits and deny a 60(b) motion filed after a notice of appeal, because the district court's action is in furtherance of the appeal. When the district court is inclined to grant the 60(b) motion, however, then it is necessary to obtain the leave of the court of appeals. Without obtaining leave, the district court is without jurisdiction, and cannot grant the motion.

*Willie v. Continental Oil Co.,* 746 F.2d 1041, 1046 (5th Cir.1984) (citations omitted); *see also Pioneer Insurance Co. v. Gelt,* 558 F.2d 1303, 1312 (8th Cir.1977); *First National Bank v. Hirsch,* 535 F.2d 343, 345 (6th Cir.1976); *Salsbury v. United States,* 356 F.2d 822, 824 (D.C.Cir.1966).

■ This court is of the view that the second approach has more to recommend it than the first. Conceptually, it is awkward for a court to rule in a case when jurisdiction lies elsewhere. But practically, it is helpful to the appellate court to know whether the record it has is complete, whether the proposed new evidence makes a difference, and whether judicial and litigant time and resources are likely to be misspent by unnecessary transferral of the case between the courts. To the extent the trial court can provide this information about a case with which it is so far more familiar than is the court of appeals, it acts "in furtherance of the appeal." This strikes "a nice balance between the interest in finality and the desire to achieve justice...." 11 Wright & Miller, Federal Practice and Procedure § 2872 at 261. In

the present cases particularly, aspects of which have visited at least nine state and federal courts over the last ten years, it would be untoward to suggest a remand as contemplated by the first approach unless the court were inclined to grant relief. Therefore, the court will review the substance of plaintiffs' motion now.

### Considerations

■ Rule 60(b) in pertinent part says, On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: ... (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b).... A motion for relief from judgment is one for extraordinary relief entrusted to the discretion of the court, *United States v. Atkinson,* 748 F.2d 659, 660 (Fed.Cir.1984), which may be granted only in exceptional circumstances, *Washington Medical Center, Inc. v. United States,* 211 Ct.Cl. 379, 380 (1977). When seeking relief because of "newly discovered evidence," the party must show "(1) that the evidence was actually 'newly discovered'; that is, it must have been discovered subsequent to the trial; (2) that the movant exercised due diligence; and (3) that the evidence is material, not merely impeaching or cumulative, and that a new trial would probably produce a different result." *Warner v. Transamerica Insurance Co.,* 739 F.2d 1347, 1353 (8th Cir.1984). The rule is no different on summary judgment, the manner by which these cases were decided.

■ Newly discovered evidence is evidence of facts which existed at the time of decision and of which the aggrieved party was excusably ignorant. *See Brown v. Pennsylvania Railroad Co.,* 282 F.2d 522, 526 (3rd Cir.1960). To be excusably ignorant, of course, the party must have exercised due diligence in locating the evidence. And the evidence may not be merely cumulative; it must be such as would alter the outcome of the case. *See Wilson v.*

*Thompson,* 638 F.2d 801, 804 (5th Cir. 1981); *see also Warner v. Transamerica Ins. Co.,* 739 F.2d at 1353; *McKnight v. U.S. Steel Corp.,* 726 F.2d 333, 336 (7th Cir.1984).

*Evidence*

■ The request for relief from judgment is directed to one count, IV, in No. 239–79L, and to the judgment in No. 568–83C, of which the decision on Count IV was also dispositive. Plaintiffs' argument there was essentially that they were lessees of property on which they operated the Fort Washington Marina in Maryland at the time the government assumed ownership pursuant to statute in 1974. Thereafter, they continued to operate the marina until they were finally evicted in 1984. During this time, the National Park Service, as custodian of the property, so conducted itself that an implied-in-fact concession contract arose between plaintiffs and the Park Service. Count IV of No. 239–79L sought damages for breach of this contract. In No. 568–83C, plaintiffs urged that the same alleged contract qualified it as a concessioner within the contemplation of 16 U.S.C. § 20, which grants a right of preference to satisfactory concessioners who seek to renew their concession contracts.

This court held that no implied concession contract existed and dismissed both cases. In the course of the memorandum dispositive of this issue, the court observed that plaintiffs were not evaluated as a concession. This was among many factors cited in support of the decision that there was no contract implied-in-fact and that plaintiffs were on the property as tenants at sufferance. *See* Memorandum at 2, 3; *see also* 3 Cl.Ct. at 452. ·

One of the documents useful in reaching this conclusion was a 1977 evaluation of plaintiffs' operation on a form used to rate the performance of Park Service concessions. The report was directed solely to health and safety deficiencies and specifically disavowed by notations any recognition of a contractual relationship between the parties. This court said that "evalua-

tions of the operation were conducted solely to advise plaintiffs about public health and safety deficiencies, not to rate them as concessioners." Memorandum at 3.

Now plaintiffs have come up with a 1976 Park Service evaluation of their operations at the marina on a "concession evaluation" form. It includes four schedules showing that in addition to safety, the operations were evaluated similarly to other concessions on, for example, neatness of facilities, cleanliness of public areas, adherence to schedules, adherence to Park Service price schedules, courtesy, and neatness of employees. A final overall evaluation rated most aspects of the facility satisfactory. This they say shows the government evaluated their overall performance as a concessioner, and not simply for health and safety purposes as the court concluded. This is the "newly discovered evidence" at issue.

It appears that prior to January 4, 1984, plaintiffs' records of their operations were in an office at the marina. On January 4, they were ejected from the marina and the government put the records into file boxes and moved them to a warehouse. The records were available to plaintiffs at the warehouse but they say the facilities were not conducive to review or sorting. They recovered the records on March 30, 1984. Plaintiff Wilson came across the 1976 evaluation report in March of 1985.

Plaintiffs say they "did not know they had a copy of this document" before March of 1985, and did not know it existed. In their brief on appeal, however, they say, "Wilson was evaluated regularly in 1975, 1976, 1977 and it is believed 1978. Inspection records for 1975 and 1976 were believed lost in flood at the Marina. Wilson did, however, provide his affidavit in this regard ... The form used varied from year to year, but was always a Concessioner Evaluation form."

There is a basic inconsistency here. Wilson may not have remembered he had retained a copy of the document, but he has admitted knowledge of its existence and familiarity with its substance. Indeed, his initials appear on several pages of the doc-

ument and his signature is on the final evaluation form. Why he did not recover it from his files before 1985 after the case was ostensibly finished is not explained. But unawareness of the contents of his files cannot excuse his failure to produce it. The court concludes plaintiffs were not excusably ignorant of the documents' existence.

Plaintiffs say they could not have discovered the document by due diligence because their records were not available to them at a "critical time in the proceedings when this document was pertinent and important." This is apparently a reference to the three-month storage period after their eviction and while briefing was in progress in No. 239–79L. But it was a year later that they came upon the document in their files. If plaintiffs believe that "the Court might have reached a different conclusion" if this document had been presented, they surely were on notice of this in 1983 when the similar 1977 evaluation proved insufficient. *See* 3 Cl.Ct. at 452. This should have caused a search to begin for a document which has apparently been in their possession since its receipt except possibly for three months. Because they had actual knowledge of its existence, they alternatively could have sought a copy from defendant, if indeed it had not already been produced during the extensive discovery process. The court concludes they failed to exercise due diligence in locating the document.

Nevertheless, in light of the age and stage of the cases, the court will consider whether the document makes a difference to the outcome. Plaintiffs say the evaluation undercuts the court's observation that they were evaluated solely for health and safety purposes, which is true. The critical issue, however, is not whether they were ever evaluated as a concession, but whether as a result of the conduct of the parties an implied contractual relationship arose. *See* 3 Cl.Ct. at 450. The absence of an evaluation as a concession was but one factor leading to the conclusion that no implied contract existed.

Even this new document when viewed in its entirety works against plaintiffs. The copy they attached to their motion is missing three schedules. The complete document was provided by defendant in response. The missing schedules support the conclusion that no contractual relationship existed. The 1976 report does rate plaintiffs' overall operation of the marina as satisfactory. But the Park Service comment accompanying schedule 2 says, "Contractual requirements with Yachts America [are] currently under development." It further says, "All items under schedule 2 will be prepared in conjunction with the proposed contract." Schedule 3 shows that several of the listed elements "[w]ill be prepared in conjunction with contractual procedures." Additional Park Service comments at the end of schedule 3 say,

> We expect to have permit prepared in three—six months. P/L 93–444 provided for termination of parcel "D," which was Fort Washington Marina, by 12/31/79. P/L 93–444 was succeeded by 94[–578] Congress [sic] which allowed for removal of parcel "D" as a terminated unit. *All efforts will be made to bring Fort Wash. Marina under a concession contract as soon as possible*—[Emphasis added.]

Both schedules were initialed by plaintiff Wilson.

The proposed concession contract and permit referred to in the last quoted notation did not come to fruition. The government explains that the Park Service's mistaken expectation that a concession contract was imminent explains why plaintiffs were evaluated in 1976 as a concession. In 1977 when it was clear that no contract was to be forthcoming, the Park Service again rated plaintiffs' performance, but noted on the report that no contract existed. *See* 3 Cl.Ct. at 452.

Be that as it may, since it is undisputed that plaintiffs had no express contract covering the marina, the notations in 1976 anticipating that they would be brought under a concession contract in the future does not detract from the court's holding that the Park Service did not deal with them on an implied contractual basis.

They refute the notion that a contract of any kind existed between them. Indeed, the 1976 evaluation is cumulative evidence that reinforces the court's decision. *See, e.g., Jasany v. United States Postal Service,* 755 F.2d 1244, 1253 (6th Cir.1985).

This was a unique, aberrational situation where the government procrastinated in coming to grips with its hold over tenants, and "permitted plaintiffs to linger on at the marina." Memorandum at 3. Regardless of the forms used from time to time, the record shows unmistakably that the government exercised no real control of plaintiffs as they could have if they had had a contractual relationship. And plaintiffs operated pretty much as they saw fit even in the face of periodic government attempts to assure minimum standards.

Doubtlessly, plaintiffs might have brought the situation to a head if they had not complied to some extent with the Park Service's requests. After all, they were on government property. But cooperation, whether willing or apprehensive, did not give rise to a contract. The court supposes the government could have ousted plaintiffs at anytime before 1984, but there was no implied contract on which it could rely to enforce their performance.

Under the circumstances the government's efforts were merely exhortatory. Plaintiffs were not significantly disadvantaged by the Park Service's forbearance. They operated the business for nearly ten years without the burden of the mandatory constraints imposed on contractual concessions; they paid no fees; they paid no rent. Contrary to plaintiffs' suggestion, the court concluded from this and the other material evidence of record that there was no objective manifestation of a contract between the parties. The "new" evidence does not affect this conclusion.

*Misconduct*

■ Although plaintiffs have not moved for relief under Rule 60(b)(3) for "fraud ..., misrepresentation, or other misconduct" of defendant, they do raise the issue in their papers. In the interest of completeness, the court will address it briefly. They argue that the government should have produced a copy of the 1976 evaluation in the course of discovery. They say first that in response to their interrogatories in No. 239–79L defendant neither referred to nor produced the evaluation. Defendant responds that it did not interpret the interrogatories as asking for this document.

Having reviewed the interrogatories, the court concludes defendant's interpretation is not unreasonable. In any event, because plaintiffs were aware of the existence of the evaluation, and did not object to defendant's answers to the interrogatories, it is too late now.

Next they say that in No. 568–83C they attempted to secure all documents which had not previously been provided through interrogatories. This court issued a protective order for documents covering the period October 15, 1976, through September 23, 1983, previously produced in No. 239–79L. Defendant admits that because of the large volume of documents produced in response to plaintiffs' interrogatories and Freedom of Information Act requests, it is possible that the 1976 evaluation was not produced. But the document was in plaintiffs' possession throughout, and they are charged with knowing of its existence. They have made no showing of misconduct on the part of defendant.

*Conclusion*

Accordingly, plaintiffs' motion for relief from the judgments is DENIED.

## APPENDIX

YACHTS AMERICA, INC. and THOMAS BRUCE WILSON, Plaintiffs,

v.

THE UNITED STATES, Defendant.

No. 239–79L

In the United States Claims Court

November 19, 1984

**MEMORANDUM ORDER**

MAYER, Judge.

*Count IV*

Plaintiffs' Count IV, added to the complaint by amendment here in the Claims

Court after remand in the Court of Claims, asks for damages for breach of an implied concession contract with the National Park Service to which they were entitled. This court discussed the necessary elements of an implied in fact contract in the earlier memorandum dealing with plaintiffs' request for an injunction. *Yachts America, Inc. v. United States*, 3 Cl.Ct. 447, 451 (1983). It was there made clear that a contract implied in fact is a true contract, the agreement of the parties being inferred from the circumstances. It is not, of course, a contract imposed by operation of law over which this court has no jurisdiction. The earlier memorandum also said that, based on what had been presented theretofore, plaintiffs had a significant hurdle to overcome to prove an implied contract as a concessioner when the government thought they were tenants at sufferance. *Id.*

The court has now thoroughly reviewed the voluminous record that has accumulated in this case, and concludes that the facts do not show the existence of a contract implied in fact between the Park Service and plaintiffs for a concession operation at the Fort Washington Marina. Plaintiffs were tenants at sufferance, having properly and legally entered into possession of the property under the earlier lease with Fort Washington Marina, Inc., but holding over upon the expiration of that lease until the government finally removed them. See discussion at 289–90, *infra*. The entire situation is an example of how not to do things. It has been marked by inertia and confusion from the start. But the court concludes that the government is correct that plaintiffs merely continued to operate the marina as tenants at sufferance from the date of the expiration of their lease, October 31, 1974, until they were ejected and removed in 1984.

Only once in this long odyssey did the Park Service express any willingness for plaintiffs to operate the marina on specific terms, as the equivalent of a contractual concessioner. That was when it offered an orderly termination permit in its December 10, 1975, letter to them. Plaintiffs, however, did not accept those terms and the offer was withdrawn on September 21, 1976. Thereafter, they had no obligation to the government to continue the marina operation, and the government had no obligation to allow them to either occupy the property or operate the marina.

A concession contract implied between the parties would be expected to parallel the requirements of an express contract. An express contract would contain terms and conditions covering the duration of the authorization; specifying services to be provided; regulating rates and charges to users; specifying the ownership of any improvements and responsibilities for maintenance and repair; establishing utility arrangements; setting up a reporting procedure for operations, income, and expenditures; setting franchising and user fees; and other matters that would control the proper use of the public's land. None of this is found in our situation by implication or otherwise.

The Concessions Policy Act of 1965 invests the Secretary of the Interior with the discretion to issue concession contracts or permits. *See* 16 U.S.C. § 20a. The scope of his discretion is restated in National Park Service regulations. *See* 36 C.F.R. § 51.2. The procedural requirements for issuance of concession contracts and permits are specified primarily at 36 C.F.R. § 51.4. Only under exceptional circumstances can they be waived and a contract or permit negotiated without public notice and advertising. *See Id.* § 51.4(f). Nothing like this happened here until 1982. That led to, among other things, the filing of a request for injunctive relief by plaintiffs which was addressed by this court's memorandum and order found at 3 Cl.Ct. 447.

Nor was there any substantive equivalent of compliance with these requirements which might lead the court to conclude the parties entered into an agreement by implication. The evidence shows no meeting of minds about a concession contract on any

terms. Plaintiffs may have made some repairs on the premises as they say, but defendant required nothing more than health and safety related repairs or maintenance. Indeed, government officials did not believe they had the authority to tell plaintiffs how to operate or repair the marina without a concession contract, although they did request that plaintiff Wilson stop charging launching fees, stop running a disco operation, and clean up the boat yard. They did come in and make some repairs and improvements to docks and parking lots. But at no time did they evaluate plaintiffs as a concession, contrary to plaintiffs' assertions. Similarly contrary to plaintiffs' assertions, and as discussed earlier by the court, 3 Cl.Ct. at 452, evaluations of the operation were conducted solely to advise plaintiffs about public health and safety deficiencies, not to rate them as concessioners. So this evidence does nothing to show an implied contract between the parties.

The Interior Department Inspector General's report both parties cited gives a fair picture of what happened here. Plaintiffs were already in place when the government became the owner of the property. The Park Service procrastinated in its decision about how best to administer the property and apparently let the situation drift until recently. Contributing to the drift, was plaintiffs' multiplicity of suits. At one time or another, issues pertaining to this property have been addressed by the courts of Maryland, the District Court of Maryland, the Court of Appeals for the Fourth Circuit, the District Court for the District of Columbia, the D.C. Circuit, the Court of Claims, the Federal Circuit, and even the Supreme Court. In the face of this multifaceted legal onslaught it is perhaps understandable that a portion of the period during which plaintiffs were allowed to stay was given over by defendant to see how the courts handled the matter. There was no contract of any kind, however, merely a forebearance by the government that permitted plaintiffs to linger on at the marina.

Plaintiffs rely heavily on a letter dated June 12, 1978, from the acting Superintendent of the National Capital Parks East to the Prince Georges County, Maryland, Board of License Commissioners, to show that defendant did not regard them as tenants at sufferance. They emphasize that this letter said they were "hold-over tenants," but do not explain what they believe this means. "Hold-over tenant" is another, more modern, term for tenant at sufferance. *See generally* Restatement (Second) of Property, ch. 14, especially Introductory Note; see also discussion at 289–90, *infra.* So plaintiffs' argument cuts against their position and shows the government's view of their status remained the same throughout.

*Count II*

█ Count II claims compensation for the taking of plaintiffs' leasehold, or at least governmental interference with what remained of their lease with Fort Washington after Pub.L. No. 93–444 was passed on October 15, 1974. The lease expired October 31, 1974, some 17 days later. There is no dispute that plaintiffs continued in possession until the lease expired. When the Court of Claims considered this question it declined to decide "whether government actions during these 17 days deprived Yachts of its leasehold notwithstanding Yachts' continuing possession" because the then existing record was not clear on the point. *See Yachts America, Inc. v. United States*, 673 F.2d 356, 363 [230 at Ct.Cl. 26] (1982) (*Yachts I*).

There is nothing in the complaint about any government actions that might amount to interference with the lease during this 17 day period. On these motions for summary judgment, the affidavit of the regional director of the National Capital Region says,

The National Park Service took no action to terminate the lease or to require plaintiffs to surrender possession of the leased property during the period of October 15, 1974, to November 1, 1974. The National Park Service took no action of any nature with respect to the operations of Fort Washington Marina during

the period of October 15, 1974, to November 1, 1974. Specifically, during that period, the National Park Service did not: 1) make any demands that plaintiffs make repairs and perform maintenance on the property of Fort Washington Marina; 2) exercise dominion over the property by ordering plaintiffs to cease and desist any acts whatsoever; or 3) insist that plaintiffs conform to National Park Service concessioners' standards. The first action of the National Park Service after the legislative taking of Fort Washington Marina on October 15, 1974, was to send written notification to Fort Washington Marina sub-lessees and slip owners advising them of the legislative taking. [Paragraph numbers omitted.]
The letter that was sent to the sub-lessees and slip owners he cites is dated November 4, 1974, three days after expiration of plaintiffs' lease.

In response, plaintiff Wilson filed an affidavit that says,

During the period from October 15, 1974, through December 31, 1979, the National Park Service has made repeated demands of your plaintiffs to make repairs and perform maintenance on the property of Fort Washington Marina and exercised dominion over the property by ordering the plaintiffs to cease and desist certain acts which did not involve waste of the property or safety, but were purely business considerations, and on other occasions insisting that plaintiffs conform to National Park Service concessioners' standards.

This is insufficient to raise a genuine issue of material fact about whether or not interference with the final 17 days of plaintiffs' lease occurred. The regional director pointedly denied that the government took any action whatsoever during that specific time period. Plaintiffs' response addresses generally the more than five years from October 15, 1974, to December 31, 1979.

The requirements to withstand a motion for summary judgment and show that there is a genuine dispute over a material issue of fact are well known. The burden

on the party resisting the motion for summary judgment is not stringent. *First National Bank v. City [Cities] Service Co.*, 391 U.S. 253, 288 [88 S.Ct. 1575, 1592, 20 L.Ed.2d 569] (1968). "However, once the moving party has produced evidence which apparently establishes a material fact, the non-movant may not discharge his burden by cryptic, conclusory or generalized responses.... 'He must set forth specific facts showing there is a genuine issue for trial.'" *Campbell v. United States*, 2 Cl.Ct. 247, 249 (1983). Plaintiffs' general response is insufficient. Therefore, the court concludes there was no interference with the lease, much less a compensable taking, for that 17 day period.

Even if the government had in some way "interfered" with plaintiffs' leasehold, by its own terms the lease would have terminated. Clause 12 of plaintiffs' lease with Fort Washington Marina, Inc., anticipated a governmental taking, and provided that the lease would terminate as of the time possession had to be surrendered. If possession was not required, the leasehold would continue until the end of the term. Because clause 12 also provided for an adjustment in prepaid or unearned rent in the event there was a condemnation and surrender of possession, the lease contemplated that the entire condemnation award would go to the landowner. Under this clause, plaintiffs had no estate or interest in the property left after the taking that would sustain a claim for a portion of the condemnation award. *See United States v. Petty Motors [Motor]*, 327 U.S. 372, 376 [66 S.Ct. 596, 599, 90 L.Ed. 729] (1945 [1946]); *United States v. Right to Use and Occupy 3.38 Acres of Land*, 484 F.2d 1140, 1144 (4th Cir.1973); *see also Pennsylvania Avenue Development Corp. v. One Parcel of Land*, 670 F.2d 289, 292 (D.C.Cir.1981).

Nevertheless, plaintiffs say that because the government negotiated with Fort Washington during this roughly two week period prior to the expiration of their lease, it thereby interfered with and caused a compensable taking of the leasehold. This appears to be another attempt to re-litigate

the question of the exercise of their purchase option which was appended to the lease, and which gave rise to plaintiffs' unsuccessful equitable ownership claim here. But the loss of that equitable ownership claim was not occasioned by the negotiated settlement reached between the United States and Fort Washington in June of 1975. It was plaintiffs' own settlement with Fort Washington on October 8, 1975, resulting in the entry of a consent decree in the equity action in Maryland and the execution of a mutual release. *See Yachts I*, 673 F.2d at 359, 362–63.

Plaintiffs also say that the government interfered "by controlling the premises owned by the plaintiffs and by asserting that the plaintiffs' personal property, facilities and equipment belonged to the defendant." They rely on a letter not written until September 28, 1983, from the Park Service that said that plaintiffs "shall not take any action to remove or have removed any *real property* from the Marina including all buildings and dock facilities. Title to these facilities rests with the United States...." (Emphasis added.) This letter was written when a concession contract, which had been the subject of an equity suit in this court, *see* 3 Cl.Ct. 447, had been entered into between the government and Piscataway Company. This letter has nothing to do with either the roughly two week period remaining on plaintiffs' lease in 1974, or the removal of personal property. The government makes no claim on plaintiffs' personal property.

Plaintiffs claim they also made improvements during the term of their lease, such as installation of sewers and pumps, restaurant improvements, and items of maintenance. If none of these improvements are movable trade fixtures or other personalty, which the government does not claim, plaintiffs are not entitled to any recovery because their preexisting lease controlled any sharing of the condemnation award paid to Fort Washington. *See Pennsylvania Avenue Development Corp.*, 670 F.2d at 292.

Paragraph 6 of the lease required plaintiffs to maintain the premises and make repairs at their own expense, except for the septic and sewage systems, which costs were to be equally divided between them and Fort Washington. Under paragraph 7, alterations, changes and improvements could be made by plaintiffs at their own expense. According to paragraph 17 of the lease, their right, title or interest in any of these improvements was contingent upon their exercise of the option to purchase "the leased premises, together with all improvements now in existence or hereafter placed upon the leased premises, for the purchase price and upon the terms and conditions of the sales agreement...." In view of this, and the Court of Claims' ruling that plaintiffs cannot re-litigate the question of their exercise of the purchase option, this claim is foreclosed by plaintiffs' settlement and dismissal of the breach of contract suits in Maryland and the mutual release they entered into with Fort Washington. *See Yachts I*, 673 F.2d at 362–63.

Of course, if plaintiffs' claim arises from improvements made after the legislative taking by the United States, it also fails. Once a taking has occurred, the elements of compensation are set. Improvements made thereafter are not compensable. *See, e.g., Jones v. United States*, 1 Cl.Ct. 329 (1983).

### Count I Business Claim

Plaintiffs' complaint says they were the equitable owners of the real property and business located at Fort Washington Marina as a consequence of the exercise of an option to purchase the property. As a result of the passage of Pub.L. No. 93–444, this business was taken and they should be compensated for it.

The deficiency in plaintiffs' position is that it has validity, if at all, only if they had equitable ownership of the property when it was taken. But that question was addressed and decided adversely to them by the Court of Claims. *See Yachts I*, 673 F.2d at 362–63. Therefore, whatever compensation was due for the business was

payable to Fort Washington, then the owner of the property.

Interference with or destruction of a business as a result of a legislative taking is compensable under the Fifth Amendment only indirectly, to the extent the land's adaptability for use in a particular business is an element to be considered in the valuation of the land. It is not compensable as a separate element. As the Supreme Court said in *Mitchell v. United States*, 367 [267] U.S. 341, 344–45 [45 S.Ct. 293, 294, 69 L.Ed. 644] (1925), "There can be no recovery for consequential damages for loss to plaintiff's business or for its destruction. Destruction of the business was an unintended incident of the taking of the land." *See also Klein v. United States*, 375 F.2d 825, 828 [179 Ct.Cl. 910] (Ct.Cl.1967). The documents plaintiffs filed show that the National Park Service appraisal was based on the land's highest and best use as a marina and residence. Therefore, the government indirectly compensated Fort Washington for the business to the extent the property had value for use as a marina. Since plaintiffs do not have equitable ownership of the land they also have no further claim for compensation for the taking of the business.

In the face of *Mitchell*, plaintiffs rely on *Banner Milling Co. v. State*, 240 N.Y. 533, 148 N.E. 668 (1925); *McCardle v. Indianapolis Water Co.*, 272 U.S. 400 [47 S.Ct. 144, 71 L.Ed. 316] (1926), a rate making case; and *Kimball Laundry Co. v. United States*, 338 U.S. 1 [69 S.Ct. 1434, 93 L.Ed. 1765] (1948 [1949]), involving the temporary taking of a laundry business. None of those cases is applicable here. The New York case, of course, even if in point, would not be helpful because federal, not state, law controls in federal eminent domain proceedings. *See Klein*, 375 F.2d at 829. The other two cases simply do not address our situation.

In light of the court's disposition of the Count II leasehold and improvements claims, above, plaintiffs cannot bootstrap an argument about the business taking claim on them. Likewise, because the Court of Claims held that Pub.L. No. 93–444 created no right to orderly termination which was subsequently taken, *Yachts I*, 673 F.2d at 364, and this court has held that plaintiffs have no right to a concession contract, either express or implied, there is no basis for any claim to compensation for the loss of the business.

*Count I Ownership Claim; Count III Right Of Orderly Termination Claim; Count V Statutory Concessioner's Claim*

The other claims set out in plaintiffs' complaint have been disposed of in prior litigation. *Yachts I* ruled in favor of defendant on the Count I ownership claim and the Count III right of orderly termination claim. 673 F.2d at 365.

Count V claims compensation for the taking of plaintiffs' right to use Fort Washington Marina as a concession arising from Pub.L. No. 93–444 and the Court of Claims' interpretation of that statute. The United States District Court for the District of Columbia rejected plaintiffs' interpretation of Pub.L. No. 93–444, and held that it gave them no statutory right to remain as operators of the marina indefinitely. *See Wilson v. United States*, No. 83–286 (D.D.C. June 23, 1983), *reh'g denied* (August 15, 1983), *aff'd, remanded in part*, 733 F.2d 966 (D.C.Cir.1984), *cert. denied*, sub nom. *Yachts America, Inc. v. United States*, 53 U.S.L.W. 3239 (Oct. 1, 1984). That ruling is res judicata. Therefore, plaintiffs may not re-litigate that issue in the form of Count V here.

Nevertheless, it is fair to address the apparent linchpin of plaintiffs' argument on this point. They rely heavily on dictum in the Court of Claims' decision, which said, "The implication [of Pub.L. No. 94–578, modifying Pub.L. No. 93–444], obviously, is that Yachts' existing operation was to be dealt with as would other concessions on National Park Service land." 673 F.2d at 364. The point of that language was to emphasize that the Park Service could *permit* plaintiffs to continue in operation; it was not *required* to terminate marina operations. It is undisputed that plaintiffs had no concession contract or permit for the

marina. So the Court of Claims could only have meant that plaintiffs should be dealt with as any other potential concessioner, or perhaps as a former concessioner holding over beyond its agreed term. Since passage of Pub.L. No. 94–578, it appears the Park Service has dealt with plaintiffs on that basis. In any event, this statutory entitlement argument was decided adversely to plaintiffs in the District Court and that estops them from litigating it again here.

*Counterclaim*

The government's counterclaim for rent from the date of the legislative taking of the property, October 15, 1974, to the date plaintiffs finally were removed from the premises is a difficult proposition. At common law a tenant at sufferance was under no obligation to pay rent. *See* 1 Tiffany on Real Property § 179. But this concept evolved over the years so that at the option of the landlord a tenant at sufference or one holding over could either be ejected or held to a new term and be required to pay rent at the same rate as under the former lease if there was one. Otherwise a reasonable rent could be assessed. *See generally* Restatement (Second) of Property, ch. 14. This appears to be the law governing this court. *See, e.g., Niagara Falls Bridge Commission v. United States* [76 F.Supp. 1018], 111 Ct.Cl. 338, 352, (1948); *Garrity v. United States* [67 F.Supp. 821], 107 Ct.Cl. 92, 98, (1946). Even though the government did not demand any rent from plaintiffs for their use and occupancy of the marina, its position is that plaintiffs have an implied obligation to pay a reasonable rental because there is no agreement to the contrary. *See Niagara Falls Bridge Commission* [76 F.Supp. 1018], 111 Ct.Cl. at 352.

The court is of the view, however, that there was in this unique situation an implicit understanding that the government would not charge rent. The court comes to this conclusion primarily because of evidence that the government permitted plaintiffs to continue operating at least in part because they were "providing a service to

the public." The implication is that they were doing for the public what otherwise the government itself would have to do. The situation obviously was not fully satisfactory. Indeed, it appears that under plaintiffs' tenure the marina operation was fairly troubled. Nevertheless, the attitude of government officials appeared to be that while they were trying to figure out what to do with the property, plaintiffs' operation was better than nothing and fulfilled a need.

So there was a quid pro quo: the government's forebearance, for plaintiffs' continued operation, such as it was. In the face of all that has gone on, and considering the actions and inactions of the government, the court sees no justice in assessing rent for a nearly ten year period when the first notice plaintiffs had of the government's assertion of its entitlement to rent occurred nearly five years after it acquired the property. Surely, in the face of plaintiffs' many assertions of their rights, it would have been simple for defendant to have responded that it viewed them as tenants at sufferance and that for as long as they remained they would be expected to pay rent at a specified rate. Indeed, it appears that Park Service personnel did not consider, if they considered it at all, that rent was accruing against plaintiffs. One would expect rent to be assessed and collection sought on some periodic basis, perhaps annually. It is not unfair to infer from the absence of this that rent was not expected. Only when plaintiffs started this litigation in 1979 did defendant raise the question by way of counterclaim. Under the hopefully unusual circumstances present here, this comes too late.

*Conclusion*

The court has considered all of plaintiffs' other arguments and finds them equally unpersuasive. The court agrees with the parties that there is no genuine issue as to any material facts to impede resolution of the case as a matter of law. Accordingly, the cross-motions for summary judgment

are granted in part and denied in part, and the case will ·be dismissed. No costs.

It is so ORDERED.