YACHTS AMERICA, INC., et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 568–83C.

United States Claims Court.

Sept. 22, 1983.

Stephen Leventhal, Bethesda, Md., for plaintiffs; Robert J. Zweibel, Bethesda, Md., of counsel.

Randall B. Weill, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant; M. Kevin Voyles, U.S. Dept. of the Interior, Washington, D.C., of counsel.

### MEMORANDUM AND ORDER

MAYER, Judge.

Plaintiffs, Yachts America, Inc., and its president, Thomas Wilson, have moved to preliminarily enjoin defendant's award of a National Park Service concession contract to operate Fort Washington Marina (Marina), of which they are now the operators, and their eviction. They contend the Park Service solicitation of bids was defective because it failed to grant a preference to plaintiffs as the existing concessioners of the Marina under an implied-in-fact contract, and their bid to operate the Marina did not receive full and fair consideration. Defendant opposes on the grounds that this court lacks equitable jurisdiction based on an implied contract other than one for fair consideration of a bid, and that plaintiffs have not demonstrated a basis for extraordinary relief.

Plaintiffs have already been denied injunctive relief in the United States District Court for the District of Columbia on other grounds related to this transaction. *Wilson v. United States,* No. 83–286 (D.D.C. June 23, 1983), *reh'g denied* (D.D.C. Aug. 15, 1983), *injunction pending appeal denied* (D.D.C. Aug. 26, 1983), *injunction pending appeal denied,* No. 83–1916 (D.C.Cir. Sept. 13, 1983). This motion for a preliminary injunction was filed on September 9, 1983,

hearings were held on September 13 and 14, 1983, and expedited simultaneous briefing followed. Defendant intends to award the contract on September 22, 1983. Plaintiffs were notified to vacate by September 15, 1983, but are still in place pending the outcome of litigation.

## BACKGROUND

Fort Washington Marina is in Piscataway Park, Maryland, which is managed by the National Park Service. The Marina is located on property legislatively taken by the United States on October 15, 1974, by Pub.L. No. 93–444 to preserve the setting of George Washington's home, Mount Vernon, directly across the Potomac River. At the time of the taking, the Marina was the subject of litigation between Fort Washington, Inc., the former owner, and Yachts America, Inc., its tenant.

Public Law No. 93–444, 88 Stat. 1304 (1974), provided for the orderly termination of operations on the properties taken, but was amended in 1976 by Pub.L. No. 94–578, 90 Stat. 2732 (1976), to exempt the Marina from this requirement and to permit the Park Service to continue to operate it if it so chose. Yachts America filed suit against the United States in District Court challenging the constitutionality of Pub.L. No. 93–444, but did not prevail. In 1979, plaintiffs filed suit in the United States Court of Claims seeking compensation for an alleged taking of their property. This suit is now before the United States Claims Court.

In 1978, a development concept plan was begun for the Marina, and, in 1980, both Maryland and Prince George's County expressed interest in assuming control of it. Discussions apparently continue with the state, but the Park Service decided it was in the public interest to authorize operation of the Marina on a year-to-year basis pending completion of the development plan or transfer to the state.

The Park Service prepared a prospectus inviting proposals from which it could negotiate a concessions contract for the Marina under the Concessions Policy Act of 1965, 16 U.S.C. § 20. See also 36 C.F.R. §§ 51.1–51.7 (1982). The prospectus was issued December 10, 1982, containing the following pertinent provisions:

Services to the public [at the Marina] are presently being provided by Yachts America, Inc. Yachts America, Inc., has been considered as a tenant at sufferance and as such the Marina operations have not been formally authorized under a proper authorization. Accordingly, Yachts America, Inc., has no contractual obligations nor is it entitled to any preference in the negotiation of a concession contract .... Yachts America, Inc., if not selected as the result of this proposal, shall be allowed 90 days to vacate in an orderly fashion.

All applicants are required to submit their proposals as to the percentage of gross receipts they are willing to pay to the Government.

It is proposed that a concession contract will be negotiated with the applicant selected as the one submitting the best offer in the judgment of the National Park Service. In making this selection, ... offers will be evaluated primarily on these bases:

1. Managerial competence and experience in the type of operation described herein.

2. Financial strength and ability.

3. Applicant's overall plans for operation and maintenance of the business.

The National Park Service reserves the right to disregard any proposal submitted or to make any counter-proposals which it may consider reasonable or desirable.

The attached format of the applicant's transmittal letter and Exhibit A must be used in applying for the concession opportunity and any other comments may be included therein. The proposal should be submitted ... on February 8, 1983 ....

All proposals received after this due date will not be considered, but will be returned to the sender.

The referenced Exhibit A required detailed and extensive information in a prescribed format. All proposers were required to submit information about persons

intended to be involved in the operation, including their employment history and experience, personal finances, and personal and credit references; proposed management and operation plans for the Marina; proposed financial arrangements; and proposed operating details. Plaintiffs' submission in response to this prospectus and the Park Service's disposition is discussed below. The Park Service chose the proposal of Piscataway. Company and negotiated a contract with it, the award of which is imminent.

## DISCUSSION

■ Injunctive relief should be used sparingly and should be granted only in those circumstances where the exigencies of the situation demand. *Wetzel v. Edwards,* 635 F.2d 283, 286 (4th Cir.1980). The primary factors a court considers in determining whether to grant this extraordinary relief are well established. *See Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d 841, 842 (D.C. Cir.1977). Chief among them are: whether there is a strong showing that plaintiff is likely to prevail on the merits of the underlying dispute; whether plaintiff will suffer irreparable injury without this relief; whether other parties interested in the proceedings would be substantially harmed if the relief were granted; and considerations of the public interest. *See Wetzel v. Edwards,* 635 F.2d at 287; *Washington Metropolitan Area Transit Commission v. Holiday Tours, Inc.,* 559 F.2d at 843; *N.V. Philips Gloeilampenfabrieken v. United States,* 1 Cl.Ct. 783, 784 (1983) (YOCK, J.).

■ Plaintiffs first request relief as disappointed bidders, alleging breach of the implied-in-fact contract between the United States and bidders in government procurements that all bids submitted in conformity with the requirements of the invitation for bids will be fully and fairly considered. *See Keco Industries, Inc. v. United States,* 192 Ct.Cl. 773, 778, 428 F.2d 1233 (1970); *Heyer Products Co. v. United States,* 135 Ct.Cl. 63, 69–70, 140 F.Supp. 409 (1956); *Ingersoll-Rand Co. v. United States,* 2 Cl.Ct. 373, 375 (1983) (KOZINSKI, C.J.); *Quality Furni-*

*ture Rentals, Inc. v. United States,* 1 Cl.Ct. 136, 139 (1983) (KOZINSKI, C.J.). For plaintiffs to prevail on this theory, they must show that they submitted a bid in conformity with the requirements of the prospectus issued by the Park Service which thereby gave rise to this implied contract and that there was no rational basis for rejection of their bid. *See M. Steinthal & Co. v. Seamans,* 455 F.2d 1289, 1301 (D.C. Cir.1971); *Dean Forwarding Co., Inc. v. United States,* 2 Cl.Ct. 559, 565 (1983) (HARKINS, J.); *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983) (LYDON, J.).

Plaintiffs have asserted a series of deficiencies in the process of proposal evaluation by the Park Service's evaluation board. The court does not consider any of them because plaintiffs did not submit a proposal even remotely responsive to the invitation, and plaintiff Wilson's testimony confirms that, notwithstanding counsel's insistence that their submission was a proposal entitled to consideration, plaintiffs did not intend to bid.

The request for proposals required bidders to submit specific and detailed information so the applicants' plans for operation and maintenance of the Marina, managerial competence and experience, and financial strength and ability could be assessed. Plaintiffs did not submit any of this data. Their response to the solicitation was a two-page letter from their attorney suggesting that the United States deal with their existing operation as it would have dealt with any other concession on National Park Service land in 1974 and that it need not supply documentation as requested by the prospectus because this information was already in the possession of the United States. Counsel attached a copy of a complaint for an injunction and damages to be filed in the United States District Court for the District of Columbia, and cited the 1982 Court of Claims decision in *Yachts America, Inc. v. United States,* 230 Ct.Cl. 26, 673 F.2d 356 (1982), now Claims Court Case No. 239–79L.

At the hearing on this injunction, Donald Roush, Chief of the Division of Concessions

Management for the National Capital Region of the Park Service, testified that he knew plaintiffs could come in and make a proposal without huge start-up costs and he believed they were really the only potential bidder who could make a go of this operation. He said, "There was only one person that I expected an offer on and you could have knocked me over with a feather when I got six, or five." Wilson testified,

"Well, Mr. Roush, I understood him to testify earlier and I concur 100%, he said just what he said when he testified. He said, you could have knocked me over with a feather when you did not submit a proposal. And I told him that the reason that I did not feel like that I should be bidding on this, we have previously discussed, but in addition to that, I did not see how in the world I would stand an opportunity to make a profit. And he said, 'I agree Tom. I do not see how anyone else could operate this and do a job and make a profit on this except you.' "

The documents submitted to the Park Service, and the testimony of Wilson, confirm that plaintiffs did not, nor did they intend to, submit a bid responsive to the proposal. Even after that submission, the Park Service warned them that it was not responsive and invited them to submit a proposal before the closing date. Plaintiffs' only response to that second chance was a letter from counsel reiterating the earlier position. They had every opportunity to participate in this process, but consciously chose not to. It would be an injustice for this court to now accept counsel's protestations that this was a bid which was not properly considered.

■ Plaintiffs present yet another basis on which they believe they are entitled to equitable relief. The essence of their claim appears to be that as a result of the conduct of the parties since the United States became the owner of Piscataway Park a contract implied in fact predating this solicitation has arisen. Because 16 U.S.C. § 20, and the implementing regulations, specifically 35 C.F.R. § 51.5, grant an existing

satisfactory concessioner of the Park Service a right of preference to a new concession contract, plaintiffs' implied contract qualified it as a concessioner within the contemplation of the statute and regulations. Defendant failed to honor this right of preference and thereby violated the regulation which by operation of law was a term of the contract.

Plaintiffs recognize that under the *Ingersoll-Rand, supra,* line of cases, their claim on this theory is outside the jurisdiction of the court. The implied contract triggering the equitable power of this court in those cases is the implied contract for full and fair consideration of a bid submitted responsive to a solicitation. Even a responsive bidder is disabled from challenging the legality or propriety of a solicitation or basing injunctive relief on supposed violations of statute or regulation in the solicitation process. Therefore, one who has submitted a wholly unresponsive bid does not invoke the duty of the government to fully and fairly evaluate it, and has no contractual basis from which to attack the solicitation process. Defendant vigorously urges that for this reason alone the court does not have jurisdiction to entertain plaintiffs' request for a preliminary injunction and they are left to their remedy at law for damages.

■ Though neither party addressed it, a recent case has held that exercise of the equitable authority of the court is not limited to the bid protest cases. *American Hoist & Derrick, Inc. v. United States,* 3 Cl.Ct. 198 (1983) (COLAIANNI, J.). Because this court has jurisdiction over "any express or implied contract," 28 U.S.C. § 1491(a)(1), and because section 1491(a)(3) authorizes injunctions "to afford complete relief on any contract claim brought before the contract is awarded . . .," the court held a plaintiff which alleges an implied-in-fact contract with the government guaranteeing a right to bid on a future solicitation had asserted a contract claim directly relating to the prospective award of the contract. Therefore, this court had jurisdiction even though the plaintiff had been unable to bid. *Id.* at 7.

Though the legislative history of the Federal Courts Improvement Act carries a passage that the court's equitable jurisdiction was limited to bid protest cases, *see* S.Rep. No. 275, 97th Cong., 1st Sess. 23 (1981), 1982 U.S.Code Cong. & Ad.News 11; *Quality Furniture Rentals,* 1 Cl.Ct. at 140, the plain language of the statute gives no hint that this was the intent of Congress. *American Hoist* cogently explains the language used and provides a convincing analysis of the seminal case of *United States v. John C. Grimberg Co.,* 702 F.2d 1362 (Fed. Cir.1983), as not foreclosing the availability of equitable relief on a claim of a pre-existing implied contract related to the prospective award of an express one.

The exercise of the equitable authority of the court, though, depends on plaintiffs establishing their entitlement to it. They must show a significant likelihood of prevailing on the merits of their claim of an implied contract and that they will suffer irreparable harm if the court does not exercise its discretion to order a preliminary injunction.

█ "It is well established that an implied-in-fact contract requires a meeting of the minds which is inferred from the conduct of the parties and, in the light of surrounding circumstances, shows their tacit understanding and agreement. *Somali Development Bank v. United States,* 205 Ct.Cl. 741, 508 F.2d 817 (1974), and *Algonac Mfg. Co. v. United States,* 192 Ct.Cl. 649, 428 F.2d 1241 (1970). Such an implied contract requires the same elements as an express contract, i.e., an offer, acceptance and consideration. *Baltimore and Ohio R.R. Co. v. United States,* 261 U.S. 592, 43 S.Ct. 425, 67 L.Ed. 816 (1923)." *Fincke v. United States,* 230 Ct.Cl. 233, 244, 675 F.2d 289, 295 (1982); *see also Prevado Village Partnership Composed of Twenty-Fifth Avenue Health Services v. United States,* 3 Cl.Ct. 219 (1983) (LYDON, J.). The court must, therefore, consider plaintiffs' propounded indicia of an implied contract and determine whether on the basis of this evidence there appears a significant likelihood they will ultimately be able to prove the exist-

ence of a contract entitling them to a preference.

The government's stated position is that plaintiffs are tenants at sufferance and this view is given some credence by an observation in the earlier *Yachts America* case. 673 F.2d at 365 (NICHOLS, J. concurring and dissenting). So plaintiffs will have a significant hurdle to overcome to prove an implied contract as a concessioner when defendant has consistently thought of them as something else. *See Air Terminal Services, Inc. v. United States,* 165 Ct.Cl. 525, 533, 330 F.2d 974, 978 (1964). But whatever plaintiffs were, the Court of Claims in interpreting Pub.L. No. 93–444, as clarified by Pub.L. No. 94–578, said, "The implication, obviously, is that Yachts' existing operation was to be dealt with as would other concessions on National Park Service land." 673 F.2d at 364. Plaintiffs only recently tried to persuade the United States District Court for the District of Columbia that this language made them a statutory concessioner of the Park Service. The court disagreed. *Wilson v. United States,* No. 83–286 (D.D.C. Aug. 15, 1983).

Plaintiffs' was a unique situation resulting from a legislative taking of their erstwhile lessor's interest in the park but leaving them in place. They, of course, have pending a separate action claiming that certain of their interests were also taken and it includes a claim for the alleged breach of this very implied-in-fact contract. The evidence shows that the Park Service more or less allowed plaintiffs to continue in operation as before the taking with little hindrance or control while it studied options for the use of the property and determined how next to proceed.

The facts relied upon by plaintiffs to show that the conduct of the parties has resulted in an implied contractual relationship are not persuasive of the likelihood of ultimate success. In their post-hearing brief, they say, "Mr. Wilson testified under cross-examination as follows: that he is paying the same fees as paid by others whose property was taken under the same law (Pub.L. No. 93–444)." Wilson did say

that but the rest of his statement was: "The answer is no, we are not paying any fee to the Park Service, but neither was anyone else under the law required to pay a fee." There is no evidence that plaintiffs have made payments of any kind to defendant.

Wilson testified that he was expected to comply with memoranda and directives to correct safety deficiencies, to comply with local and state health department requirements, and to be available for inspection by local agencies. For all that appears, however, this is an obligation that tenants would be under irrespective of their status. Wilson also testified that the Park Service said, "directly or indirectly," to correct anything that needed to be repaired, rebuilt or replaced. Notwithstanding that this was an obligation plaintiffs undertook in their predecessor lease with Fort Washington, Inc., and conceivably could be an obligation of a tenant at sufferance as well, plaintiffs have not explained how these directives, if given, might be viewed as indications of the government's intent to treat them as contractual concessioners. Nor does this testimony mean much unless the official who gave the instructions had the actual authority to do so, *Operational Manuals, Inc. v. United States*, 205 Ct.Cl. 854, 506 F.2d 1406 (1974), and plaintiffs acted on them.

Plaintiffs made much of a 1977 evaluation report on a form apparently used to rate the performance of Park Service concessions, though testimony is confusing on this point. Review of this exhibit shows, however, that it does not concede any contractual relationship with plaintiffs. The place for a score for the annual contractual review rating is marked "N.A.—none existing," and the contractual review worksheet is marked "No Report . . . no contract-pending." This is inconsistent with plaintiffs' position. The court is not convinced plaintiffs have carried their burden of showing likelihood of success.

There is, however, an even more profound reason for withholding the extraordinary relief of an injunction. A comparison of the provisions of 35 C.F.R. § 51.4, under which the solicitation was issued, and section 51.5, the provision plaintiffs argue should have been followed, shows that, while the differences are specified, under either section plaintiffs were required to submit a proposal. It appears the procedures and considerations of section 51.5 as they relate to solicitation, evaluation and negotiation of a contract are essentially the same as those of section 51.4. Plaintiffs' documents purporting to be a proposal, as already discussed, were unenlightening about their plans, abilities, and finances, and did not afford the Park Service any basis upon which to determine whether to enter into negotiations with them. Knowing the view of the Park Service that they were merely tenants at sufferance and not contractual concessioners, and the fact that these very questions were at issue in long-standing litigation, it was imprudent of plaintiffs to precipitate this crisis by standing on legalities when a bona fide proposal might well have avoided it and given them what they now profess to want.

Assuming it was necessary, the cover letter of plaintiffs' purported proposal, cryptic though it was, effectively preserved its litigation posture in Case No. 239–79L in this court. Had it been accompanied by a proposal capable of evaluation, the Park Service might well have negotiated a contract with them. Indeed, testimony shows Park Service officials expected that plaintiffs were the likely awardees of the contract and probably the only ones who could make a go of it, primarily because they were already in place. They were surprised to receive so many other proposals. On the other hand, if another proposal had been evaluated as superior and the Park Service stood on its position that plaintiffs had no right of preference entitling them to meet that offer under section 51.5, that would have been time enough for plaintiffs to seek the assistance of the court.

But from the evidence at the hearing, it appears plaintiffs' position was not based solely on perceived entitlements under the law. Wilson testified that, "In addition to that, I did not see how in the world I would

stand an opportunity to make a profit." Testimony further showed that a Park Service representative did not see how anyone else could operate and make a profit except plaintiffs, either. Of course, the court has no way of knowing whether plaintiffs or anyone else can make a profit, but plaintiffs made a business decision not to submit a proposal, which in retrospect appears to have been a mistake. Contrary to Park Service expectations, five other proposals were received and a contract has been negotiated. Plaintiffs now insist that they should have the right to meet this proposal and be awarded the contract.

The deficiency in plaintiffs' position is that regardless of which provision of the concessions regulations the Park Service should have invoked, plaintiffs have submitted no proposal responsive to the Park Service's invitation. The public interest embodied in the regulatory scheme envisions each bidder, including an existing concessioner, making its best offer. It does not serve that interest to permit plaintiffs to sit on their hands until others, apparently in a less advantageous position than they, have set the ceiling and then ask a court of equity to order the government to give them the contract. It would be an abuse of discretion to issue an injunction on that basis.

The situation now existing implicates the public interest as well as the interests of third parties. The public interest is reflected in the obligation of the Park Service to operate Piscataway Park and to achieve some kind of control over the operation of the Marina which heretofore has been essentially lacking. Another party has negotiated a contract acceptable to it and the Park Service, the award of which is imminent. To delay the award would be a significant detriment to that party.

In light of Case No. 239–79L now pending before the court, it appears that if plaintiffs were ultimately to establish their claims, they would have an adequate remedy at law. Similarly, if plaintiffs were to vacate the Marina, testimony shows that the Uniform Relocation Assistance and Real

Property Acquisition Act of 1970, 42 U.S.C. §§ 4601 *et seq.,* is available to assist them and to compensate for the move. In light of these factors and plaintiffs' business decision not to do all they reasonably could be expected to do to retain occupancy of the Marina, the court is not convinced that they will suffer irreparable harm if a preliminary injunction is not issued.

Accordingly, it is ORDERED that plaintiffs' motion for a preliminary injunction is DENIED.