THE RYAN COMPANY, Plaintiff,

v.

The UNITED STATES, Defendant,

v.

The Chappy Corporation, Intervenor.

No. 99–113C.

United States Court of Federal Claims.

May 20, 1999.

David A. Vogel, Washington, D.C., attorney of record for plaintiff. Barbara G. Werther, of counsel.

Karla Joan de Steuben, Washington, D.C., Department of Justice, with whom was Acting Assistant Attorney General David W. Ogden, for defendant. Corlyss Drinkard, National Aeronautics and Space Administration, of counsel.

Timothy E. Heffernan, McLean, Virginia, attorney of record for intervenor.

## OPINION

ALLEGRA, Judge.

This post-award bid protest action is before the court on the parties' cross-motions for summary judgment on the administrative

record. At issue is whether defendant acted arbitrarily and capriciously, and contrary to law, in determining that plaintiff's bid for electrical services was nonresponsive and in awarding the contract, instead, to the second lowest bidder. After carefully reviewing the submissions of the parties, and following oral argument, the court grants the defendant's motion for summary judgment.

## I. Facts

On October 9, 1998, the Lewis Research Center of the National Aeronautic and Space Administration (NASA) in Cleveland, Ohio,[1] issued Invitation for Bids (IFB) No. IFB3–107034. The IFB sought bids from contractors for a fixed price amount for "the supervision, labor, equipment, materials and testing to rehabilitate and modify the High Voltage Electrical Power System at the NASA Lewis Research Center." The IFB contained a bidding schedule, criteria for the bids and specifications for the services requested. The focus of the dispute in this case is the interpretation of section M of the IFB, which sets forth the "Evaluation Factors For Award."

Section M establishes three bid evaluation criteria: (1) Cost; (2) Preliminary Schedule; and (3) Major Equipment. Subsection M.3.2., Preliminary Schedule, states, in pertinent part:

The Contractor shall submit with his bid a preliminary schedule outlining how he intends to achieve the major task items required to accomplish the contract. The schedule shall show projected task start and end dates. This preliminary schedule shall be used as the basis to generate the actual sequencing of construction tasks should the contractor become the successful bidder. From the contractor's preliminary schedule the Government will be able to determine the contractor's understanding of the job tasks and his ability to reasonably plan his tasks minimizing the impact on operations at the Center. The reasonableness of the schedule will be based on a comparison with the Government's preliminary schedule and a compar-

ison with all other bidders schedule responses.

Subsection M.3.3., Major Equipment, provides, in pertinent part:

The contractor shall provide, with his bid, Manufacturer's Catalog cuts (showing salient characteristics) for the major equipment which he intends to furnish in response to the specs and drawings. The contractor is also to provide data showing that the proposed manufacturer has been producing the specific class of major equipment for a minimum of 20 years and the same class of major equipment has been in successful service with utilities or Government agencies within the United States for a period of 15 years.... **Major Equipment**—transformers, breakers, switches, cable, and switchgear.

Subsection M.1 further states that there are no Federal Acquisition Regulations (FAR) provisions or NASA FAR Supplement provisions incorporated by reference into section M. However, section L, titled "Instructions, Conditions, and Notices to Officers," incorporates by reference a number of FAR and NASA FAR Supplement provisions, including FAR 52.214–21, Descriptive Literature. This provision states:

(a) *Descriptive literature* means information (e.g., cuts, illustrations, drawings, and brochures) that is submitted as part of a bid. Descriptive literature is required to establish, for the purpose of evaluation and award, details of the product offered that are specified elsewhere in the solicitation and pertain to significant elements such as (1) design; (2) materials; (3) components; (4) performance characteristics; and (5) methods of manufacture, assembly, construction, or operation. The term includes only information required to determine the technical acceptability of the offered product. It does not include other information such as that used in determining the responsibility of a prospective Contractor or for operating or maintaining equipment.

(b) Descriptive literature, required elsewhere in this solicitation, must be (1) identified to show the item(s) of the offer to

---

1. The Lewis Research Center is now called the Glenn Research Center.

which it applies and (2) received by the time specified in this solicitation for receipt of bids. Failure to submit descriptive literature on time will require rejection of the bid, except that late descriptive literature sent by mail may be considered under the Late Submissions, Modifications, and Withdrawals of Bids provision of this solicitation.

(c) The failure of descriptive literature to show that the product offered conforms to the requirements of this solicitation will require rejection of the bid.

48 C.F.R. § 52.214–21 (1998).

NASA received seven bids in response to the IFB. On December 4, 1998, Angel Pagan, a contracting officer with NASA at the Lewis Research Center, conducted the bid opening and certified that the bids were opened, read, and recorded. Mr. Pagan asked Sue Gaudreau, the project manager for this contract, to review the three lowest priced bid packages under the bid evaluation criteria identified in section M of the IFB. Ms. Gaudreau was assisted in the evaluation by Louis Bernhardt, the High Voltage Power System Manager at the Research Center. Ms. Gaudreau and Mr. Bernhardt each independently reviewed the three bids according to the section M evaluation factors—cost, preliminary schedule, and major equipment. Plaintiff, the Ryan Company (Ryan), had the lowest bid at $6,871,900. The Chappy Corporation (Chappy), the intervenor in this action, had the second lowest bid at $7,047,400. Lake Erie Electric (Lake Erie) had the third lowest bid at $7,804,785.

To evaluate the acceptability of the preliminary schedules, Ms. Gaudreau and Mr. Bernhardt reviewed each submitted preliminary schedule to determine the bidder's understanding of the job tasks and its ability to plan tasks reasonably while minimizing the impact on government operations. They could not evaluate plaintiff's bid because it did not submit a preliminary schedule. Upon review of the other two low bids, they determined that both Chappy's and Lake Erie's preliminary schedules were acceptable.

To review the catalog cuts for acceptability, Ms. Gaudreau and Mr. Bernhardt independently compared the bidder's catalog cuts against the salient characteristics for major equipment identified in the IFB. In so doing, both relied upon their experience with equipment from the same manufacturer identified in the catalog cuts. Thus, in analyzing several products, Ms. Gaudreau and Mr. Bernhardt relied on the catalog cuts to demonstrate certain salient characteristics and on their experience with equipment from the same manufacturer to demonstrate others. Ms. Gaudreau and Mr. Bernhardt each determined that Chappy's catalog cuts for major equipment satisfied all of the major salient characteristics set forth in the IFB, with no exceptions. Lake Erie's catalog cuts also were deemed acceptable. They, however, did not evaluate plaintiff's bid in this manner because plaintiff did not submit any catalog cuts with its bid.

On December 7, 1998, Ms. Gaudreau forwarded the results of her review to Mr. Pagan, the contracting officer. Mr. Pagan concluded that Ryan, which had submitted the lowest priced bid, was nonresponsive due to its failure to submit a preliminary schedule and manufacturer's catalog cuts. Sometime after December 7, 1998, NASA contacted Michael Grady, the vice president of Ryan, to inform him of this preliminary conclusion. On December 17, 1998, Leo McNamara, an attorney for Ryan, sent a memo to Jerald Kennemuth, an attorney for NASA, disputing NASA's finding that plaintiff's bid was nonresponsive. Mr. McNamara argued that the IFB's requirements for a preliminary schedule and catalog cuts were matters of contractor responsibility rather than responsiveness, and, therefore, a failure to comply with either requirement did not render plaintiff's bid nonresponsive. On December 23, 1998, Kaprice Harris, counsel for NASA, wrote back to Mr. McNamara and advised him that the preliminary schedule requirement, as plaintiff argued, was not a matter of responsiveness, but she maintained that the catalog cuts requirement was a matter of responsiveness. NASA and plaintiff continued to correspond regarding the significance of the catalog cuts requirement.

On January 4, 1999, plaintiff filed a bid protest with the United States General Ac-

counting Office (GAO), claiming that NASA erroneously determined that plaintiff's bid was nonresponsive for failure to submit catalog cuts. On January 19, 1999, the GAO dismissed plaintiff's protest as premature because NASA had not issued a final decision regarding the responsiveness of plaintiff's bid. On January 26, 1999, NASA requested that the GAO provide a nonbinding, advisory written opinion on the issue of whether plaintiff's bid was responsive. In response to this request, a GAO attorney-advisor issued an oral advisory opinion that plaintiff's bid was nonresponsive. By letter dated February 26, 1999, Mr. Pagan rejected plaintiff's bid as nonresponsive for failure to submit manufacturer's catalog cuts on major equipment. On the same day, Mr. Pagan notified Chappy that it was awarded the NASA contract.

On March 5, 1999, plaintiff filed a bid protest claim in this court seeking injunctive and declaratory relief that would require defendant to deem plaintiff's bid responsive, to terminate the award to Chappy, and to conduct a preaward survey to determine if plaintiff is responsible, and if so, award the contract to plaintiff. The awardee, Chappy, filed a motion to intervene, which was granted. Defendant agreed to suspend performance of the contract until May 21, 1999. The parties have filed cross-motions for summary judgment on the administrative record.

## II. Discussion

As this court has frequently said, federal agencies generally are free to choose with whom they wish to contract and this court will interfere with the government procurement process "only in extremely limited circumstances." *CACI, Inc.–Federal v. United States*, 719 F.2d 1567, 1581 (Fed.Cir. 1983) (quoting *United States v. John C. Grimberg Co.*, 702 F.2d 1362, 1372 (Fed.Cir. 1983)). In a case filed post-award, this court will enjoin performance of the contract only where the agency's actions were arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C.

§ 706(2)(A) (1994 & Supp.1997). *See also* 28 U.S.C. § 1491(b)(4) (Supp.1997). Regarding this standard, which is drawn from the Administrative Procedures Act (APA), 5 U.S.C. §§ 701–706 (1994 & Supp.1997), the Supreme Court has stated:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (citations omitted). *See also Honeywell, Inc. v. United States*, 870 F.2d 644, 647 (Fed.Cir.1989); *Blount, Inc. v. United States*, 22 Cl.Ct. 221, 227 (1990).[2] It is the burden of the aggrieved bidder to demonstrate that there was no rational basis for the agency's decision or that the challenged agency decision involved a clear prejudicial violation of applicable statutes and regulations. *Analytical & Research Tech., Inc. v. United States*, 39 Fed.Cl. 34, 42 (1997); *Aero Corp. v. United States*, 38 Fed. Cl. 739, 749 (1997). Because injunctive relief is so drastic in nature, the plaintiff must demonstrate its right to injunctive relief by "clear and convincing evidence." *Bean Dredging Corp. v. United States*, 22 Cl.Ct. 519, 522 (1991).

Motions for judgment on the administrative record are treated in accordance with the rules governing motions for summary judgment. RCFC 56.1. *See ECDC Envtl., L.C. v. United States*, 40 Fed.Cl. 236, 240 (1998). Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judg-

---

**2.** By its very definition, this standard recognizes the possibility that there exists a zone of acceptable results in a particular case and requires only that the final decision reached by an agency be the result of a process which "consider[s] the relevant factors" and is "within the bounds of reasoned decisionmaking." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983).

ment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A motion for summary judgment on the administrative record is often an appropriate vehicle to scrutinize an agency's procurement actions because the issues in such cases typically involve contractual and regulatory interpretation, thereby presenting no genuine issues of material fact. *Analytical & Research Tech., Inc.,* 39 Fed.Cl. at 43. Here, the administrative record, as supplemented by this court,[3] reveals no genuine dispute as to any material fact and, for the reasons set forth below, defendant is entitled to judgment as a matter of law.

### A. Responsiveness vs. Responsibility

The initial question in this case is whether the request in the IFB for submission of "catalog cuts" on major equipment was a matter of "bid responsiveness" or "bidder responsibility."

■■■ The "responsiveness" requirement derives from the statutory provision requiring an award be made to the bidder "whose bid conforms to the solicitation." 10 U.S.C. § 2305(b)(3) (Supp.1997); 41 U.S.C. § 253b(c) (Supp.1997). As to responsiveness, 48 C.F.R. § 14.301 (1998), provides that "[t]o be considered for award, a bid must comply in all material respects with the invitation for bids. Such compliance enables bidders to stand on an equal footing and maintain the integrity of the sealed bidding system." *See also* 48 C.F.R. § 14.404–2(a) (1998). Hence, in determining responsiveness, the contracting officer juxtaposes the bid against the invitation for bids to determine whether the former conforms in all material respects to the latter. *Bean Dredging Corp.,* 22 Cl.Ct. at 522 ("Responsiveness addresses whether a bidder has promised to perform in the pre-

cise manner requested by the government."). The rationale for enforcing the responsiveness requirement is "to avoid unfairness to other contractors who submitted a sealed bid on the understanding that they must comply with all of the specifications and conditions in the invitation for bids, and who could have made a better proposal if they imposed conditions upon or variances from the contractual terms the government had specified." *Toyo Menka Kaisha, Ltd. v. United States,* 220 Ct.Cl. 210, 597 F.2d 1371, 1377 (1979).[4]

■■■ As to "responsibility," 48 C.F.R. § 9.103 (1998), provides that "[n]o purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility." The contracting officer's responsibility determination focuses on the bidder's ability to satisfy its contractual commitments encompassed within its responsive bid. *See Essex Electro Eng'rs, Inc. v. United States,* 3 Cl.Ct. 277, 283 (1983). To be responsible, a contractor must, *inter alia,* have adequate financial resources; a satisfactory record of performance, integrity, and business ethics; and the necessary organization, skills, and production facilities. 48 C.F.R. § 9.104–1 (1998). *See Blount, Inc.,* 22 Cl.Ct. at 227. Unlike with responsiveness, in assessing the contractor's responsibility, the contracting officer is not limited to the information contained in the bid when opened, but instead is expected to solicit additional information demonstrating that the contractor is capable of performing the contract work. 48 C.F.R. § 9.105–1 (1998).

In identifying whether a particular requirement is related to responsiveness or responsibility, the distinction then "is whether the bidder will conform to the IFB, as opposed to how the bidder will accomplish conformance." *Bean Dredging Corp.,* 22 Cl.Ct. at 522 (quoting *Essex Electro*

---

**3.** In this case, the court permitted the supplementation of the administrative record filed by defendant to include a copy of Chappy's bid, any documents analyzing the responsiveness of that bid, and affidavits from the contracting officers explaining how they evaluated the responsiveness of Chappy's bid. *See Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 342 (1997) (describing the circumstances in which this court may supplement the administrative record).

**4.** As explained by this court, another rationale for this requirement is "to avoid the 'toils of ambiguity,' when courts are called upon to conduct autopsies on poorly written agreements." *Firth Constr. Co. v. United States,* 36 Fed.Cl. 268, 274 (1996) (quoting *WPC Enters., Inc. v. United States,* 163 Ct.Cl. 1, 323 F.2d 874, 875 (1963)). *See also* John Cibinic, Jr. & Ralph C. Nash, Jr., *Formation of Government Contracts* 537–38 (3d ed.1998).

*Eng'rs, Inc.*, 3 Cl.Ct. at 283 n. 8). Thus, if descriptive literature [5] designed to show the characteristics of a product is to be used to determine a bidder's ability or capacity to perform, the matter will be one of responsibility, and failure to submit the information will not be fatal. On the other hand, if the descriptive literature is to be used to ensure the nature of the work the bidder is agreeing to accomplish, the matter will be one of responsiveness, and failure to submit the information obliges the government to reject the bid. "Although easily stated, this distinction can be difficult to apply in practice, even when the IFB declares that compliance is a question of responsiveness." *Essex Electro Eng'rs, Inc.*, 3 Cl.Ct. at 283 n. 8.

■ Because descriptive literature can go either to responsiveness or responsibility, the FAR establish requirements that must be followed when an agency intends such data to be used to establish responsiveness. In this regard, the FAR provide that "[b]idders shall not be required to furnish descriptive literature unless the contracting office needs it to determine before award whether the products offered meet the specification and to establish exactly what the bidder proposes to furnish." 48 C.F.R. § 14.202–5(b) (1998). Under the regulations, an IFB that includes a requirement that bidders submit descriptive literature must state: "(i) what descriptive literature is to be furnished, (ii) the purpose for which it is required, (iii) the extent to which it will be considered in the evaluation of bids, and (iv) the rules that will apply if a bidder fails to furnish the literature before bid opening or if the literature furnished does not comply with the requirements of the invitation." 48 C.F.R. § 14.202–5(d) (1998). Where these requirements are not met, a provision requiring technical data generally relates to bidder re-

sponsibility, rather than bid responsiveness. *See FloorPro, Inc.*, 94–1 CPD ¶ 32 (1994); *Acoustic Sys.*, 92–2 CPD ¶ 123 (1992).

The IFB issued by NASA in the current case complied with the requirements of the FAR, both by its explicit terms and by its incorporation of the standard descriptive literature clause set out at 48 C.F.R. § 52.214–21 (1998). First, the IFB told bidders what descriptive literature was to be provided. Section M.3.3. states that the contractor "shall provide, with his bid" manufacturer's catalog cuts "(showing [the] salient characteristics) for the major equipment which he intends to furnish in response to the specs and drawings." Second, the IFB informed bidders of the purpose for which this information was required, indicating in section L, by incorporation of the descriptive literature clause, that such literature "is required to establish, for the purpose of evaluation and award, details of the product offered that are specified elsewhere in the solicitation and pertain to significant elements." [6] § 52.214–21(a). Third, this same language indicated that the descriptive literature would be used for evaluation and section M.3.3. listed the catalog cuts under the "Bid Evaluation Criteria." Finally, the IFB informed bidders what would happen if the descriptive literature was not provided or inadequate, stating, in section L, again by incorporation, that "[f]ailure to submit descriptive literature on time will require rejection of the bid" and reemphasizing, "[t]he failure of descriptive literature to show that the product offered conforms to the requirements of this solicitation will require rejection of the bid." § 52.214–21(b)–(c). Consequently, a fair reading of the IFB, as a whole, confirms that it meets the requirements of the FAR so as to make the provision regarding the catalog cuts therein a matter of responsiveness.

5. Descriptive literature is defined in the FAR as:

[I]nformation, such as cuts, illustrations, drawings, and brochures, which shows the characteristics or construction of a product or explains its operation. It is furnished by bidders as a part of their bids to describe the products offered. The term includes only information required to determine acceptability of the product. It excludes other information such as that furnished in connection with the quali-

fications of a bidder or for use in operating or maintaining equipment.
48 C.F.R. § 14.202–5 (1998).

6. This section of the IFB further indicated that such descriptive literature "includes only information required to determine the technical acceptability of the offered product" and does not "include other information such as that used in determining the responsibility of a prospective contractor." § 52.214–21(a).

For its part, Ryan essentially argues that requests for literature regarding products ordinarily pertain to responsibility and that, as a result, the IFB's request in section M that information "must" be submitted with a bid should not be read literally. In the next breath, Ryan contends that the descriptive literature clause in section L does not cure this problem because the standard clause does not "by itself" establish a descriptive literature requirement. This might be a close case had the IFB here only contained either the requirement in section M indicating that literature was to be provided and evaluated or the descriptive literature clause in section L. But here, **both** provisions were present and, in such circumstances, the agency's determination that these provisions, in combination, relate to responsiveness was appropriate and neither irrational nor unreasonable.[7] Indeed, Ryan's construction of the IFB would render the descriptive literature clause reference meaningless, thereby violating the settled principle that an IFB should be read as a whole in order to give effect to all of the provisions of the solicitation. *See Allied Tech. Group, Inc. v. United States,* 39 Fed.Cl. at 138.[8]

In fact, contrary to Ryan's claims, the Comptroller General and the Board of Contract Appeals have repeatedly recognized that the descriptive literature requirement is a matter of responsiveness when used, as here, for the purpose of bid evaluation. *See DataExpert Corp. v. Dept. of Labor,* 95–1 BCA ¶ 27,438 (1995) (rejection of bids as nonresponsive "fitting and in keeping with provisions of the solicitation's descriptive literature clause"); *Alaska Unlimited,* 94–2 CPD ¶ 87 (1994) (same in case involving lease of heavy equipment); *J.T. Sys., Inc.,* 94–1 CPD ¶ 150 (1994) (same in case involving turbine for desalinization plant); *National Window, Inc.,* 93–1 CPD ¶ 327 (1993) (same in case involving window and air conditioning installation); *Washex Mach. Corp.,* 84–2 CPD ¶ 352 (1984) (same in case involving components of laundry system); *Zero Mfg. Co.,* 83–2 CPD ¶ 35 (1983) (same in case involving two abrasive cleaning machines); *Thermal Reduction Co.,* 83–2 CPD ¶ 180 (1983) (same in case involving pathological incinerator); *Fabcraft Inc.,* 76–2 CPD ¶ 384 (1976) (same in case of installation of window film).[9] By comparison, cases cited by Ryan are distinguishable as they either involve equipment to be used by a contractor in performing a contract, rather than equipment to be purchased and installed at a particular location, *see, e.g., Bean Dredging Corp.,* 22 Cl.Ct. at 522–23 (equipment to be used in dredging the entrance channel to a

7. Ryan notes that other seemingly mandatory provisions in the IFB were first construed by NASA to relate to responsiveness, but then conceded to involve responsibility. For example, the IFB indicates that the contractor "shall submit" a preliminary schedule. Ryan notes that, as in the case of the descriptive literature, the IFB indicates that these submissions will be evaluated. But, critically, these provisions were not augmented by the inclusion in the IFB of a clause such as the descriptive literature clause, so as to make clear under the FAR, via the combination, that they related to responsiveness.

In addition, Ryan points out that section M, in which the catalog cuts sentence appears, states that "none" of the FAR's standard clauses are "pertinent to the provisions" thereto and it argues, therefore, the descriptive literature clause in section L is unrelated to the catalog cuts provision. But, Ryan's contention ignores the fact that the provisions in section L, entitled "Instructions, Conditions, and Notices to Offerors," were intended to provide guidance for responding to the rest of the solicitation. For example, among the other FAR provisions incorporated by reference in section L are ones requiring bids to be in English and offers to be in U.S. currency. While these provisions were not explicitly incorporated into section M, they obviously were intended to apply to that section. Moreover, the descriptive literature provision incorporated in section L explicitly indicated that it applied to the "details of the product offered *that are specified elsewhere in the solicitation.*" (emphasis added). Accordingly, in giving effect to the whole solicitation, this court must reject Ryan's attempt to balkanize the agreement. *See Allied Tech. Group, Inc.,* 39 Fed.Cl. 125, 144–46 (1997) (rejecting a similar argument).

8. *See also T. Brown Constructors, Inc. v. Pena,* 132 F.3d 724, 730 (Fed.Cir.1997); *Dalton v. Cessna Aircraft Co.,* 98 F.3d 1298, 1305 (Fed.Cir. 1996); *Gould, Inc. v. United States,* 935 F.2d 1271, 1274 (Fed.Cir.1991); *Fortec Constructors v. United States,* 760 F.2d 1288, 1292 (Fed.Cir. 1985).

9. These cases, which involve a variety of complex equipment and systems, also belie Ryan's assertion that descriptive literature clauses are used ordinarily only in invitations for bids seeking simple, fungible products.

harbor), or are cases in which the standard descriptive literature clause was inserted in the IFB, in isolation, without other supporting language indicating which products were subject to the clause, *see, e.g., Adrian Supply Co.*, 93–2 CPD ¶ 3 (1993).[10]

Likewise erroneous is Ryan's claim that NASA's interpretation of the IFB renders meaningless the submittal process contained in the IFB. In essence, Ryan contends that if the IFB requires the submission of descriptive literature as a test of bid responsiveness, it cannot also require a submittal process. But, contrary to Ryan's claim, it appears that the submittal process served at least three distinct purposes here that are consistent with viewing the descriptive literature provisions as relating to responsiveness. Thus, the submittal process: (i) was necessary to allow NASA to review and finalize the characteristics of major equipment that were not salient; (ii) was necessary to allow NASA to consider the acceptability of equipment that was not major; and (iii) allowed NASA to collect technical information on major and minor equipment that would be stored for future use in maintaining, repairing and supplementing the electrical system.[11]

 Even if we accepted Ryan's construction of the IFB as reasonable, it would give rise, at best, to a patent ambiguity. A patent ambiguity is one that is recognized as "an obvious omission, inconsistency, or discrepancy of significance." *Beacon Constr. Co. v. United States*, 161 Ct.Cl. 1, 314 F.2d 501, 504 (1963).[12] The doctrine of patent ambiguity is an exception to the rule of *contra proferentum*, to ensure that contractors do not take unfair advantage of the government by remaining silent in the face of a significant and obvious ambiguity in the contract. *Newsom v. United States*, 230 Ct.Cl. 301, 676 F.2d 647, 649 (1982). Under this doctrine, when a solicitation presents conflicting signals, a contractor is under an affirmative duty to call the ambiguity to the attention of the contracting official. If it fails to do so, it may not argue before this court that its interpretation is proper. *See Allied Tech. Group, Inc.*, 39 Fed.Cl. at 139; *CACI Field Servs., Inc.*, 13 Cl.Ct. 718, 726–27 (1987), *aff'd*, 854 F.2d 464 (Fed.Cir.1988).[13]

10. Ryan also argues that NASA failed to satisfy the FAR's procedural requirements for descriptive literature because NASA failed to insert into the contract file an explanation of the reasons for the requirement as required by 48 C.F.R. § 14.202–5(c) (1998). The failure to comply with this requirement did not prejudice Ryan since this documentation would not have been available to bidders as part of the solicitation. As such, this error does not warrant setting aside NASA's procurement decision. *See Calma Co.*, 83–2 CPD ¶ 31 (1983) (written justification for use of descriptive literature is a matter of form and does not constitute a basis for sustaining protest). *See also Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1048 (Fed.Cir.1994) ("Overturning awards on de minimis errors wastes resources and time, and is needlessly disruptive of procurement activities and governmental programs and operations.") (quoting *Andersen Consulting v. United States*, 959 F.2d 929, 932 (Fed.Cir.1992)); *SMS Data Prods. Group, Inc. v. United States*, 900 F.2d 1553, 1557 (Fed. Cir.1990); *Anderson Columbia Envtl., Inc. v. United States*, 43 Fed.Cl. 693 (1999).

11. Indeed, by its own admission, Ryan construes the regulations as requiring an "all or nothing approach," under which agencies are forced to choose between: (i) requiring descriptive literature and purchasing equipment based solely on that literature, without further inquiry or review; or (ii) not requiring such literature and taking the chance in a complex procurement that the low bidder has misapprehended or ignored key product specifications in formulating its bid. But, nothing in the regulations governing descriptive literature requires such a choice between Scylla and Charybdis. To the contrary, it appears that agencies may rely upon descriptive literature to determine whether the product offered by a vendor meets the salient characteristics specified in the IFB, so as to ensure that a low bid truly is responsive, and then use a submittal process to resolve questions regarding nonsalient characteristics of the product offered, to ensure fine tuning before final acceptance.

12. The Federal Circuit also has held that "[a] contract provision is deemed to be patently ambiguous if it is susceptible of two different yet reasonable interpretations, each of which is consistent with the contract language and with other provisions of the contract, and if the ambiguity would be apparent to a reasonable person in the claimant's position." *Lockheed Martin IR Imaging Sys. Inc. v. West*, 108 F.3d 319, 322 (Fed.Cir. 1997). *See also Community Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575, 1579 (Fed.Cir.1993).

13. *See also United Int'l Investigative Servs. v. United States*, 109 F.3d 734, 738 (Fed.Cir.1997); *Lockheed Martin IR Imaging Sys. Inc.*, 108 F.3d at 322; *Fortec Constructors*, 760 F.2d at 1291.

■ Nothing in the record in this case indicates that plaintiff satisfied its duty of inquiry. We presume both Ryan and the government to be "endowed with at least a modicum of business acumen," *Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21, 444 F.2d 547, 551 (1971), and we view Ryan as a knowledgeable bidder. As such, Ryan should have recognized that its construction of section M of the IFB was squarely in conflict with the inclusion of the descriptive literature clause in section L, essentially rendering the latter clause meaningless. The patent ambiguity obviously associated with Ryan's interpretation created an obligation on its part to consult with the contracting officials before submitting its proposal in order to clarify the purpose of the descriptive literature clause.[14] Instead, Ryan elected to submit its bid without descriptive literature. Accordingly, Ryan may not now raise its interpretation of sections L and M of the IFB, so as to render the descriptive literature clause "useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous." *Hol–Gar Mfg. Corp. v. United States,* 169 Ct.Cl. 384, 351 F.2d 972, 979 (1965).

In sum, there is adequate evidence that the IFB here called for descriptive literature as a matter of responsiveness. As such, Ryan's failure to furnish that literature appropriately resulted in its bid being rejected as nonresponsive. Accordingly, Ryan's challenges on these grounds must fail.

### B. Unequal Treatment

■ Ryan also argues that NASA unfairly determined that the catalog cuts which Chappy submitted with its bid were responsive and that in deciding that they were responsive, NASA did not treat Ryan and Chappy equally. As a preliminary matter, the court must determine whether Ryan has standing to raise this issue.

In 1996, Congress amended the Tucker Act, 28 U.S.C. § 1491, to grant the Court of Federal Claims jurisdiction to entertain post-award bid protest actions. *See* Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, § 12, 110 Stat. 3870, 3874–75 (1996) (ADRA). Prior to this amendment, this court had jurisdiction to decide pre-award bid protest actions under the theory that by soliciting bids the government impliedly entered into a contract to consider all bids in a fair and honest manner. *See W & D Ships Deck Works, Inc. v. United States,* 39 Fed.Cl. 638, 640–41 (1997); *GraphicData, LLC v. United States,* 37 Fed.Cl. 771, 778 (1997).[15] This analysis derived from the fact that the controlling statute gave this court jurisdiction to afford complete relief on any "contract claim" brought before a contract was awarded. 28 U.S.C. § 1491(a)(3) (1994). Under this contract analysis, this court repeatedly held that submitting a nonresponsive bid did not give rise to the implied contract of fair dealing. Thus, in *Yachts America, Inc. v. United States,* 3 Cl.Ct. 447, 450 (1983), this court stated that "one who has submitted a wholly unresponsive bid does not invoke the duty of the government to fully and fairly evaluate it, and has no contractual basis from which to attack the solicitation process." *See also Control Data Sys., Inc. v. United States,* 32 Fed.Cl. 520, 524 (1994); *Drexel Heritage Furnishings, Inc. v.*

As this court stated in *Gresham, Smith & Partners v. United States,* 24 Cl.Ct. 796, 803 (1991):

The principle of patent ambiguity deters a "bidder, who knows (or should know) of a serious problem in interpretation, from consciously taking the award with a lower bid ... with the expectation that he will then be able to cry 'change' or 'extra' if the procuring officials ..." disagree with the contractor's interpretation.

(citation omitted). *See also Allied Tech. Group, Inc.,* 39 Fed.Cl. at 139 ("The duty to seek clarification of discrepancies is a preventative measure, designed to avoid confusion, and needless litigation, regarding matters that can be clarified and resolved early in the contracting process.").

**14.** Such clarification would have been readily forthcoming as NASA had already informed all the other bidders, who, unlike Ryan, had attended a pre-bid site visit, that the descriptive literature requirement related to responsiveness.

**15.** *See also New Am. Shipbuilders, Inc. v. United States,* 871 F.2d 1077, 1079 (Fed.Cir.1989); *NKF Eng'g, Inc. v. United States,* 805 F.2d 372, 375–76 (Fed.Cir.1986); *CACI, Inc.–Federal v. United States,* 719 F.2d 1567, 1573 (Fed.Cir.1983); *United States v. John C. Grimberg Co.,* 702 F.2d 1362, 1367 (Fed.Cir.1983) (en banc).

**656**

*United States,* 7 Cl.Ct. 134, 144 (1984), *aff'd,* 809 F.2d 790 (Fed.Cir.1986); *Electro–Methods, Inc. v. United States,* 3 Cl.Ct. 500, 506 (1983), *aff'd in part, rev'd in part,* 728 F.2d 1471 (Fed.Cir.1984); *Hero, Inc. v. United States,* 3 Cl.Ct. 413, 416 (1983).

The 1996 amendments to the Tucker Act gave this court and the district courts concurrent jurisdiction to decide both pre-award and post-award bid protest actions. Under this amendment, which repealed the prior version of section 1491(a)(3), this court's jurisdiction no longer depends upon whether a contract of fair dealing exists. *Ramcor Servs. Group, Inc. v. United States,* 41 Fed. Cl. 264, 268 (1998) ("The 1996 Tucker Act amendments obviate such a requirement."). Rather, the amendment indicates that:

> [This court] shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1) (Supp.1997). As Ryan's claims obviously involve "the award of a contract," the critical question is whether Ryan, having been determined to be a nonresponsive bidder, is, nonetheless, an "interested party" for purposes of attacking the responsiveness of Chappy's bid.

Since the Tucker Act does not define "interested party," this court has looked for guidance to judicial interpretations of 31 U.S.C. § 3551(2) (Supp.1997), which defines this phrase, in establishing standing requirements for procurement protests before the GAO, as "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *See WinStar Communications, Inc. v. United States,* 41 Fed.Cl. 748, 756 (1998); *Mike Hooks, Inc. v. United States,* 39 Fed.Cl. 147, 153 (1997); *CC Distribs., Inc. v. United States,* 38 Fed. Cl. 771, 775–78 (1997); *Cincom Sys., Inc. v.*

*United States,* 37 Fed.Cl. 663, 669–70 (1997). In addition, prior to 1996, the Federal Circuit decided several cases addressing the issue of who was an "interested party" for purposes of filing a protest with the Government Services Board of Contract Appeals (GSBCA) under the Brooks Act, 40 U.S.C. § 759(f) (1994). The definition of "interested party" used to define standing under this Act was identical to that used in section 3551(2). *Compare* 31 U.S.C. § 3551(2) (Supp.1997) *with* 40 U.S.C. § 759(f)(9)(B) (1994).[16] Two of the Federal Circuit's decisions construing the Brooks Act are particularly instructive.

The first, *United States v. IBM Corp.,* 892 F.2d 1006 (Fed.Cir.1989), involved a protest filed by IBM to the award of a contract for automated data processing equipment. IBM, the fourth lowest bidder, protested an award to the lowest bidder. The GSBCA held that IBM was an "interested party" under the Brooks Act, but the Federal Circuit reversed. It found that the phrase "interested party" constituted "a meaningful limitation on the authority of the [GSBCA] to entertain, and this court to review, protests of an agency's conduct." 892 F.2d at 1012. Carving out a firm rule for determining whether a bidder was an "interested party," the court held that a "nonresponsive bidder" was not an "interested party" within the meaning of the Brooks Act, explaining:

> We see responsiveness as another facet of the interested party inquiry. When responsiveness is an issue, it must be resolved before the board can proceed. If a bid is not responsive, the protester has no more right to invoke the office of the board than the proverbial man on the street. A nonresponsive bidder is the epitome of one who lacks a direct economic interest. This is not a mere technicality; it is the predicate for the board's right to intervene in governmental procurements. A bidder's standing to protest a contract given to another cannot be divorced from the responsiveness of its offer.

*Id. See also Protests of Rocky Mountain Trading Co.—Sys. Div.,* 90–2 BCA 22,739

---

**16.** In 1996, 40 U.S.C. § 759, which included the GSBCA's bid protest jurisdiction regarding automated data processing equipment, was repealed.

*See* Pub.L. No. 104–106; § 5101, 110 Stat. 680 (1996).

(1990) (relying on *IBM* in concluding that a nonresponsive bidder may not raise the question of the responsiveness of the awardee's successful bid); *RRRS Enters., Inc.*, 91–1 CPD ¶ 551 (1991) (holding that a nonresponsive bidder is not an "interested party" within the meaning of 31 U.S.C. § 3551(2)).

In the second referenced case, *MCI Telecommunications Corp. v. United States*, 878 F.2d 362 (Fed.Cir.1989), the Federal Circuit again construed the language of 40 U.S.C. § 759(f)(9)(B), this time in deciding whether MCI, as a major subcontractor under a bid, had standing as an "interested party" to file a protest with the Board of Contract of Appeals. Noting that section 759(f)(9)(B) defined an "interested party" as an "actual or prospective bidder," the Federal Circuit first held that MCI was not an "actual bidder" as it had not submitted a bid, but rather had been a subcontractor of a bidder. 878 F.2d at 364. MCI, however, argued that it was a "prospective bidder" because its protest was designed to result in a resolicitation on which it intended to bid as a prime contractor. But, the Federal Circuit rejected this claim, holding that to be a "prospective bidder" one "must be *expecting* to submit an offer prior to the closing date of the solicitation." *Id.* at 365 (emphasis in original). The court held that MCI did not fall within this class, reasoning that "[s]ince the opportunity to qualify either as an actual or a prospective bidder ends when the proposal period ends, MCI's stated intention to submit a proposal in response to any resolicitation, and its efforts to secure resolicitation by filing a protest, can do nothing to create the necessary interested party status." *Id. See also Federal Data Corp. v. United States*, 911 F.2d 699, 704 (Fed.Cir.1990) ("[R]eference to a 'prospective bidder' in the definition of interested party in the statute does not include one who only intends to bid in the event of a reprocurement."); *IBM*, 892 F.2d at 1011 ("The speculative prospect of cancellation of the solicita-

tion and initiation of a new one is insufficient to suffuse all other bidders with the requisite interest to support standing.").

The *IBM* decision thus plainly instructs that the phrase "interested party" does not include a party that makes a nonresponsive bid, holding that such a party is no different than the "proverbial man on the street." By way of further explanation, the *MCI* decision applies a plain meaning analysis of the critical statutory language in similarly concluding that a nonresponsive party is not a "prospective bidder" so as to be an "interested party" simply because it seeks a resolicitation of a contract. *See* William L. Murphy, *The Federal Circuit and the GSBCA: Review of Protest Decisions*, 40 Am. U.L.Rev. 1065 (1991). Applying the rationale of these decisions, which construed identical language in a very similar context, this court believes that the phrase "interested party," as used in 28 U.S.C. § 1491(b), does not include a bidder, such as Ryan, determined to be nonresponsive, whose only chance of winning a contract is in a resolicitation.[17]

Prior to 1996, however, at least one case in this court recognized an exception to the rule that "nonresponsive" bids did not give rise to a contract ensuring fair dealing. Plaintiff heavily relies upon this case, *Essex Electro Engineers, Inc.*, in arguing that it has standing to challenge the responsiveness of Chappy's bid. In *Essex*, the plaintiff sought an injunction restraining the Federal Aviation Administration (FAA) from awarding a contract to any bidder other than it in response to an invitation for production of engine generator sets to be used at automated flight service stations. In that case, the lowest responsive bidder was Forster Enterprises (Forster), Essex Electro (Essex) had the second lowest bid, and Introl Corporation (Introl) had the third lowest bid. Introl protested the award to Forster and eventually convinced the GAO that the bids of Forster

**17.** Notably, while Congress, in passing the ADRA, adopted the arbitrary and capricious standard in the APA, 5 U.S.C. § 706(2)(A), it did not adopt the APA's standing provisions, 5 U.S.C. § 702, choosing instead to employ the "interested party" language. *See CC Distribs., Inc.*, 38 Fed.Cl. at 777–78. This omission is significant as it is further indication that Congress intended

standing under the 1996 amendments to be narrower than the APA standing described in cases such as *Sierra Club v. Morton*, 405 U.S. 727, 734, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) and *Data Processing Service Organizations v. Camp*, 397 U.S. 150, 154, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). *See also IBM*, 892 F.2d at 1010.

and Essex were nonresponsive. Relying on the GAO decision, the FAA determined that it would award the contract to Introl. Essex filed suit in this court seeking to overturn the determination that its bid was nonresponsive, arguing, *inter alia*, that the FAA had improperly determined that Introl's bid was responsive based on literature regarding the compliance of its engine that Introl submitted during the GAO protest.

As in this case, the defendant argued that because the bid of Essex was nonresponsive, Essex could not challenge the compliance of Introl's bid. In response, this court stated "[a] claim concerning Introl's bid does not involve Essex's compliance with the solicitation and thus is irrelevant. The court agrees that the responsiveness of Introl's bid happily is not its concern today." 3 Cl.Ct. at 286–87. It went on to state, however, that "[h]ow Essex was treated vis-a-vis Introl is a proper inquiry." *Id.* at 287. In particular, the court stated that cases holding that nonresponsive bidders could not challenge other bids did not preclude it from considering this issue, reasoning:

> Although the implied contract of fair and full consideration derives from a responsive bid, the procurement authority cannot avoid the formation of this contract by determining the compliance in other than an even-handed manner. The contract of fair dealing arises upon submission of a bid. The determination of nonconformance, if the product of the contracting officer's discretion, cannot be the result of treating bidders unfairly in applying the criteria rendering a bid noncompliant.

*Id.* (citation omitted). The court concluded that the agency had treated Essex unfairly by allowing Introl, but not Essex, to supplement its bid with literature indicating that its proposed engine was compliant.

*Essex* thus held that, in deciding whether an agency had acted arbitrarily in determining responsiveness, this court could consider whether two similarly-situated bidders had been treated disparately. Seemingly, a similar exception might apply under the 1996 statute, allowing this court to decide whether a bidder has been treated unfairly vis-a-vis other bidders in being determined to be non-

responsive and, as such, not an "interested party" within the meaning of section 1491. But, here Ryan and Chappy were not similarly situated—Chappy submitted descriptive literature and Ryan did not. As such, even if this court were to recognize an exception to its construction of the phrase "interested party," the fact remains that Ryan was deemed nonresponsive here not because of unequal treatment, but because it failed altogether to submit any descriptive literature as required by the IFB. Moreover, while Ryan argues that NASA committed several errors in evaluating Chappy's bid, it also is not the case that NASA applied the descriptive literature clause to Ryan, but waived that clause as to Chappy. Rather, Ryan's situation parallels the protestor's position in *Fortran Corp. v. Dep't of Transp.*, 95–1 BCA ¶ 27,350 (1994), in which the Board of Contract Appeals stated: "[b]y asking the Board to order the FAA to call for a new round of BAFOs, Fortran is attempting to use the protest system to obtain an undeserved 'second bite at the apple' by correcting a problem which had no effect whatsoever on Fortran's chances of winning the original contract. The protest process was never intended to be used in this manner."

Based on the foregoing, the court thus concludes that Ryan does not have standing to assert deficiencies in NASA's evaluation of the responsiveness of Chappy's bid.

## III. CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment on the administrative record is GRANTED, and the plaintiff's motion for summary judgment on the administrative record is DENIED.